Patrick E. COX, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 48S00–9705–CR–313.

Supreme Court of Indiana.

June 26, 1998.

Rehearing Denied Oct. 1, 1998.

Thomas G. Godfrey, Anderson, for Appellant.

Jeffrey A. Modisett, Attorney General, Arthur T. Perry, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

In this direct appeal from a conviction for murder, Patrick E. Cox contends that:

(1) his arrest in his home without a warrant violated the Fourth Amendment of the United States Constitution and therefore incriminating statements he made to police at the police station after the arrest should have been suppressed;

(2) the prosecutor made improper remarks during trial that prejudiced his right to a fair trial;

(3) the trial court erred by admitting certain testimony, the relevance of which depended upon Cox's knowledge of the content of the testimony; and

(4) it was error to deny his motion for a continuance of the sentencing phase.

We affirm.

## Factual Background

In the early morning hours of September 22, 1995 James and Patricia Leonard were asleep in the ground floor bedroom of their home. At about 3:00 a.m. Patricia woke to look after the family dogs, returned to bed, switched on a bedroom television, and fell asleep. She was awakened by a single "loud pop sound," and quickly realized that James had been shot in the eye. James was rushed to the hospital but died three days later.

Bullet holes were found in the bedroom window and its screen, and a bullet casing was outside beneath the window. An officer who was called to the scene that night had a clear view of the inside of the bedroom from immediately outside the window. A firearms expert testified that the pattern of discoloration on the screen could have been produced only by a shot fired within six inches of the screen.

Police questioned Cox on the morning of the shooting. Cox denied any involvement in the crime and said he returned home from a nearby friend's house at about 1:00 a.m. However, later that morning one of Cox's friends told police that Cox had said that he had looked into the Leonards' window, fired a shot, and fled. Cox also told him that "Leonards probably ain't gonna have a dad after last night." Police concluded they had probable cause to arrest Cox. That afternoon, without obtaining an arrest warrant, two officers went to Cox's home. The front door to Cox's home also had a screen door. Cox answered the police knock by opening the front door but not the screen. When the officers asked him to come with them he attempted to shut the front door but an officer opened the screen door, blocked the front door, reached inside the house, and pulled Cox out by the arm. The officers then placed Cox under arrest and took him to the police station. Shortly afterward, Cox signed a waiver of rights form and told police that he fired once into the Leonards' bedroom window. He described the gun in detail and said he had thrown it into a nearby gravel pit. Meanwhile, pursuant to a search warrant, police had searched Cox's home and found a gun hidden in his bedroom. When Cox finished giving his statement, the police

showed Cox a picture of the gun and Cox identified it as the one he said he threw into the gravel pit. At trial, the firearms expert testified that this gun fired the deadly shot. In addition, Angela Bowling, a friend of Cox's, testified that she bought bullets for Cox at his request the night of the shooting and that she and a few other friends were with him at the home of Helen Johnson until Cox left between 3:30 and 4:00 a.m. Johnson was the mother of Cox's close friend, Jamie Hammer. Bowling said that Cox showed the bullets to the group and had a large object tucked into his trousers. The State contended that Cox killed Leonard as an act of retaliation because Hammer was in prison pending the resolution of charges filed against him by the Leonards for molesting their young daughter. The jury convicted Cox of murder but in a separate sentencing phase was unable to agree whether he should serve life in prison without parole. The trial court imposed life imprisonment and Cox appeals.

## I. Constitutionality of the Arrest/Admissibility of Incriminating Remarks

Cox contends that his warrantless arrest violated the Fourth and Fourteenth Amendments of the United States Constitution under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). He raises no claim under the Indiana Constitution. *Payton* resolved two different cases where the police entered a suspect's home with probable cause to arrest the suspect but without a warrant. In one, when there was no response to the officers' knock on the suspect's door, they broke it open with crowbars, entered the home, and searched for the suspect. In the other, the suspect's young son answered the police officers' knock. Police saw the suspect sitting in bed behind the son, entered and arrested him. The Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest" even when the police have probable cause to make the arrest. *Id.* at 576, 100 S.Ct. 1371. "In terms that apply

equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. 1371. Applying *Payton* to the facts of his arrest, Cox contends that the police unconstitutionally crossed the threshold of his home by opening the screen door, forcibly preventing him from closing the front door, and reaching into the house to pull him out.

■ The State responds that the arrest was constitutional under *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In that case, directly after the crime had been committed police officers who had probable cause to arrest Santana but no arrest warrant, saw Santana standing in the frame of her front doorway as they approached her house. When they shouted "police" Santana retreated into the house. The police followed her inside and arrested her. This arrest was held proper on the basis that Santana was in a public place when the police initiated the process of arrest. A warrantless felony arrest based on probable cause is constitutional if the arrest is made in a public place. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Santana's stance at the threshold of her home was "public" because "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Santana*, 427 U.S. at 42, 96 S.Ct. 2406. The Court explained that completion of the arrest by entry into Santana's home was justified by exigent circumstances, specifically "hot pursuit," and concluded "that a suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient of escaping to a private place." *Id.* at 43, 96 S.Ct. 2406. The State contends that Cox, like Santana, was standing in a "public" place—the doorway of the house—when the police initiated the arrest. There is no claim that Cox consented to the arrest,[1] nor is

---

1. Both cases involved in *Payton* concerned nonconsensual entries. *Payton*, 445 U.S. at 583, 100

S.Ct. 1371. Later in *New York v. Harris*, 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13

there any contention that exigent circumstances justified it.

■ Cox's claim involves a "threshold arrest," i.e., one made or attempted without a warrant when the suspect is either at or slightly within or behind the threshold of the home but not in front of the threshold or outside of the home. *See generally* WAYNE R. LAFAVE, 3 SEARCH AND SEIZURE § 6.1(e) (3d ed. 1996). The law in the area of threshold arrests is not entirely clear. The Supreme Court has not directly addressed the subject and the several courts that have considered it do not paint a consistent picture. Under *Payton* the police are generally not permitted to break the threshold of the home in order to make an arrest. Under *Santana,*

if police spot the suspect and identify themselves when the suspect is in view, they may pursue her into the home to complete the arrest. The unresolved questions are whether the police may cause the suspect to come into public view and then invoke *Santana* to invade the home, and whether a glass or screen door may be breached to drag the suspect out. A minority of federal and state courts rely on *Santana* and hold that because the threshold is a public place, the police may arrest a suspect there, irrespective of how that occurred.[2] Others hold that some manifestation of consent is required before the police may perform a warrantless arrest at the threshold.[3] Most courts agree that a forcible removal of a suspect from his home

(1990) and *Welsh v. Wisconsin,* 466 U.S. 740, 743 n. 1, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) the Court assumed that no valid consent was given before considering the merits of *Payton* violations. The federal circuit courts have consistently interpreted *Payton* to apply only to nonconsensual entries. *United States v. Wicks,* 995 F.2d 964, 969 (10th Cir.1993) ("absent consent or exigent circumstances police officers may not enter a dwelling to make an arrest"); *accord United States v. Conner,* 127 F.3d 663, 666 (8th Cir.1997); *United States v. Cotnam,* 88 F.3d 487, 495 (7th Cir.1996). *Cf. Snellgrove v. State,* 569 N.E.2d 337 (Ind.1991) (with probable cause to arrest but no warrant, police knocked at suspect's door and were permitted entry by suspect's fiancee; arrest held unconstitutional because no exigent circumstances existed). After police announce their intention to arrest, a gesture—such as stepping back from the threshold—or even silent acquiescence may be enough to constitute consent. *See, e.g., Cotnam,* 88 F.3d at 495 ("consent [to enter] need be neither express nor verbal"; gesture to use key to unlock door enough for consent to enter but not for consent to search); *Byrd v. State,* 481 So.2d 468 (Fla. 1985) (arrest upheld where suspect sees police in window, answers their knock, steps back from threshold, and police cross threshold to arrest; no evidence of forced entry or deception).

2. *See United States v. Carrion,* 809 F.2d 1120 (5th Cir.1987) (police asked housekeeper to knock on suspect's hotel door, suspect opened door to the call of "housekeeping," police drew weapons and arrested suspect at the threshold); *United States v. Whitten,* 706 F.2d 1000, 1015 (9th Cir.1983) (suspect answered police knock and was immediately arrested and handcuffed; no warrant required because "[a] doorway ... is a public place"); *State v. Santiago,* 224 Conn. 494, 619 A.2d 1132 (1993) (suspect answers police knock and stands directly in the doorway and refuses to consent to a search, police ask him to wait there and return several minutes later and arrest him,

still standing in the doorway); *State v. Howard,* 373 N.W.2d 596, 597 (Minn.1985) (dicta) (*Payton* "does not bar nonexigent warrantless arrests initiated at the threshold if the suspect voluntarily opens the door in response to knocking"); *People v. Burns,* 200 Colo. 387, 615 P.2d 686 (1980) (pre-*Payton* case). Consent was not a concern in these cases because the courts were of the view that the suspect relinquished his or her reasonable expectation of privacy in the home by stepping into the threshold—a public place under *Santana*—to answer the door. Other courts share this view of *Santana,* though acknowledge that the constitutionality of the arrest also depends on other factors. *See McKinnon v. Carr,* 103 F.3d 934, 935 (10th Cir.1996) (in answering police knock at door, "[a]s in [*Santana*] the suspect was visible, standing in the threshold of his doorway, open to public view. He was in a place sufficiently public that he had no legitimate expectation of privacy."; suspect also acknowledged authority of police); *United States v. Vaneaton,* 49 F.3d 1423, 1427 (9th Cir.1995) (suspect who saw police approach and answered their knock voluntarily "exposed himself in a public place").

3. *See, e.g., United States v. Berkowitz,* 927 F.2d 1376 (7th Cir.1991 ) (if arresting agents cross threshold after announcing intent to arrest and suspect recognizes authority, the arrest is constitutional; arrest is unconstitutional if police cross threshold before announcing authority to arrest); *United States v. Bradley,* 922 F.2d 1290 (6th Cir.1991) (arrest violated *Payton* where police turned up at suspect's door with an indictment and immediately arrested suspect at threshold when he answered the door), *overruled on other grounds by United States v. McGlocklin,* 8 F.3d 1037 (6th Cir.1993); *United States v. McCraw,* 920 F.2d 224, 228 (4th Cir.1990) ("a person does not surrender his expectation of privacy nor consent to the officers' entry" by partially opening door to determine the identity of those knock-

is a violation of the Fourth Amendment.[4]

It seems a dubious proposition that the threshold is always a "public" place for purposes of the Fourth Amendment. In *Santana,* the Court did not hold that the threshold was a public place under the Fourth Amendment per se. Rather, the Court said that Santana was standing in a public place because she was "exposed to public view, speech, hearing, and touch" when the police arrived at her home. Opening the door to ascertain the purpose of an interruption to the private enjoyment of the home is not an invitation to enter, but rather is a common courtesy of civilized society. Attendant to this courtesy is the ability to exclude those who are knocking and preserve the integrity of the physical boundaries of the home. *See, e.g., United States v. Berkowitz,* 927 F.2d 1376, 1387 (7th Cir.1991) ("A person does not abandon [the] privacy interest in his home by opening his door . . . to answer a knock. . . . [This] is not an invitation to [enter]."). This is particularly true where an intervening screen or storm door remains closed.

■ This conclusion is bolstered by the Court's later decision in *Payton.* There, the underlying concern was to protect the house against physical entry: "the entrance to the house . . . may not reasonably be crossed." *Payton,* 445 U.S. at 590, 100 S.Ct. 1371. As one commentator noted, "the warrant requirement makes sense only in terms of the entry, rather than the arrest; the arrest itself is no more threatening or humiliating than a street arrest." 3 LaFave at § 6.1(e), at 257 (internal quotation marks, emphasis and citation omitted). This sentiment was later approved implicitly by the Supreme Court in *New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). Neither of the cases resolved in *Payton,* however, was a knock and arrest case. Rather, each involved a more egregious entry past the threshold and into the interior of the home, where there is a greater expectation of privacy than at the threshold. There is no question that police are required by the federal constitution to obtain a warrant to arrest a suspect who hunkers down inside his home and refuses to leave or answer the door. *Payton,* 445 U.S. at 573, 100 S.Ct. 1371. Applying the *Payton* requirement to knock and arrest cases means only that a suspect may hunker down from the threshold of the home as well as the interior.

■ Although Cox makes a plausible claim that a warrant is equally required for a suspect who responds to the knock and then refuses entry, this interesting issue is of no moment to the resolution of this case. Cox contends that the incriminating statements he made at the police station should have been suppressed under the fruit of the poisonous tree doctrine. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[5] However, even if the arrest was a

ing); *United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir.1986) ("A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority."); *cf. United States v. Vaneaton.* 49 F.3d 1423, 1427 (9th Cir.1995) (by opening the door to officers after seeing them approach through a window, suspect voluntarily "exposed himself in a public place"). *See also State v. Clark,* 844 S.W.2d 597, 599 (Tenn.1992) ("Consent to enter and search a home will not be lightly inferred, nor found by mere acquiescence to unlawful authority."); *Edwards v. State,* 107 Nev. 150, 808 P.2d 528, 529 (1991) (unconstitutional entry where suspect opened door ten to fifteen inches, closed it telling police "just a minute," and police then entered immediately).

4. *See Sharrar v. Felsing,* 128 F.3d 810 (3d Cir. 1997) (police surrounded suspects' house and telephoned the suspects inside the house ordering them to come out, suspects complied and

were arrested; held that the warrantless arrest violated *Payton* ); *Fontenot v. Cormier,* 56 F.3d 669 (5th Cir.1995) (unconstitutional arrest where suspect was awakened in the middle of the night by bright lights shining through the window and went to investigate, police pointed weapons at her and asked her to open the door); *United States v. Maez,* 872 F.2d 1444 (10th Cir.1989) (police surrounded suspects' home and requested their exit by bullhorn); *Duncan v. Storie,* 869 F.2d 1100 (8th Cir.1989) (police asked suspect to come outside, suspect refused and attempted retreat, police reached inside and pulled suspect out of the house to arrest him, held arrest unconstitutional). *See also United States v. Al–Azzawy,* 784 F.2d 890 (9th Cir.1985); *United States v. Morgan,* 743 F.2d 1158, 1164 (6th Cir.1984).

5. Under this doctrine, courts must determine if the statements in question should be excluded because they were the "fruit" of an illegal act or should be admitted because they were a

violation of the federal constitution, the statement was admissible under the Supreme Court's decision in *New York v. Harris*, 495 U.S. at 14, 110 S.Ct. 1640. In that case, police had probable cause to arrest but no warrant and entered the suspect's home in violation of *Payton*. The suspect sought to suppress an incriminating statement made at the police station. In concluding that the statement was admissible, the Court squarely held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Id.* at 21, 110 S.Ct. 1640. At the motion to suppress hearing, the arresting officer testified that after exchanging notes, he and other detectives concluded at a meeting that they had probable cause to arrest Cox for murder. Cox has not contended at any time that police lacked probable cause to make the arrest. Accordingly, because Cox made his statement outside of his home following the alleged *Payton* violation, the exclusionary rule would not bar its admission even if *Payton* had been breached.

## II. Prosecutorial Misconduct

■ Cox contends that various statements by the prosecuting attorney were improper and had a cumulative prejudicial effect on the jury. We address only those statements that were preserved by objection at trial. The others are waived. *Heavrin v. State*, 675 N.E.2d 1075, 1082 (Ind.1996) (failure to object to instances of improper prosecutorial remarks during trial results in waiver on appeal). A claim of prosecutorial misconduct requires a determination that there was misconduct by the prosecutor and

that it had a probable persuasive effect on the jury's decision. The degree of impropriety of the conduct is irrelevant. *Borders v. State*, 688 N.E.2d 874, 879 (Ind.1997).[6] Cox raises the following specific contentions of prosecutorial misconduct.

■ During the State's opening statement, the prosecutor said that on several occasions Cox lied to police. The prosecutor commented that Cox initially denied involvement in the shooting, but later admitted he fired the gun. He also noted that Cox said he threw the weapon into a gravel pit but in fact it was discovered by police in Cox's bedroom. Cox contends that it was improper for the prosecutor to talk about the credibility of witnesses in opening argument and cites Indiana Rule of Professional Conduct 3.4(e),[7] which provides that during trial, a lawyer shall not "allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence ... or state a personal opinion as to ... the credibility of a witness...." These statements did not express a view as to Cox's credibility as a witness because Cox did not testify at trial. Moreover, that Cox lied to police was amply supported by the evidence. Accordingly, the prosecutor's comments were not improper.

■ In closing argument the prosecutor said that as an immediate result of the shooting, Patricia Leonard was "trying to give her dying husband mouth to mouth" at four in the morning. A major issue at trial was whether Cox intended to shoot James Leonard. Cox maintains that references to this scene were improper because they "focus on victim impact and suggest that the results of the shooting are more important than [Cox's] intent." The trial court noted Cox's objec-

---

product of the suspect's free will. In deciding whether the taint of the unlawful act has been attenuated, no single fact is dispositive. *Brown v. Illinois*, 422 U.S. at 603, 95 S.Ct. 2254. The voluntariness of the statement is a threshold requirement. Other factors to be considered are whether *Miranda* warnings were given, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Id.*

6. This is an accurate analysis of a test often described as "grave peril." This writer, for one, finds that phrase to add nothing but confusion to the analysis. Anyone on trial for a crime carrying a minimum forty year sentence is in grave peril as most people will understand the term. As explained, the term boils down to the test as stated.

7. In fact, Cox cites the former Code of Professional Responsibility D.R. 7–106(c)(4), which is now Indiana Professional Conduct Rule 3.4(e).

tion and told the prosecutor to "go ahead." Cox also contends that during argument in the penalty phase, the prosecutor improperly referred to victim impact evidence by encouraging the jury to think about the loss suffered by Leonard's wife and children. Specifically, the prosecutor said:

> think about Patty Leonard who ... told you a painful story while she sobbed. She broke down and sobbed. You think about what she lost.... [Counsel for Cox] talk[s] about throwing ... Cox's life away. Is that a horrible thing? Yes, it is.... [but] think about each of the four children who testified here. What did they lose that night? Is it a horrible thing never to be able to touch members of your family again? Absolutely.

The trial court overruled Cox's objection to these remarks stating that the State's reference to the personal loss of the victims was invited by Cox's plea for mercy from the jury. Although arguably improper, the prosecutor's comments in both instances referred to testimony given at the guilt phase, without objection from Cox, by Patricia and each of James' four children. Patricia testified that after her husband was shot, she attempted to breathe for him. Each of the children testified to their discovery of James covered in blood. The prosecutor's remarks served only to remind the jury of what they already knew and did not introduce new information or even information that Cox had considered worthy of objection when it was originally introduced. *See Angleton v. State,* 686 N.E.2d 803, 815 (Ind.1997) (sentencing judge could consider victim impact evidence where defendant did not object to admission of the evidence). Under these circumstances, the prosecutor's comments were not likely to affect the jury's deliberations even if outside the range of a discussion of the statutory aggravating circumstance.[8]

▪ In another contention of improper closing argument, Cox objected to the following question: "You think if [Cox] had fired into one of those dark windows, I would be standing here saying he intended to kill someone who happened to be in that room?" Cox contends that the question suggested that the prosecutor had "inside knowledge of these kinds of cases," specifically that the State files murder charges only against, as Cox put it, "deserving defendants." We disagree. By asking the question, the prosecutor suggested that the inference of intent to kill would have no force if Cox had fired into a dark room, but that it had force in this case because Cox fired into a lighted room. This was an appropriate argument about Cox's intent and not a subtle reference to any "inside" information held by the prosecutor.

▪ Finally, Cox contends that the following statement made by the prosecutor in the sentencing phase asked the jury to send the defendant and the community a message.

> You should feel safe. I'm not asking you to do something easy. I'm asking you to do what the law provides me to do, to stand up and do the right thing. Tell ... Cox that in Madison County we don't do that. In Madison County, we have families, we have homes. In Madison County we don't do that.

Cox did not make a contemporaneous objection but waited until after the jury had been instructed and had retired to deliberate. Failure to object to prosecutorial comments in a timely fashion results in waiver. *Cox v. State,* 475 N.E.2d 664, 670 (Ind.1985). An objection to prosecutorial comments is untimely when raised after the State has concluded its final argument. *Cleary v. State,* 663 N.E.2d 779, 782 (Ind.Ct.App.1996) (citing *Pavone v. State,* 273 Ind. 162, 402 N.E.2d 976, 979 (1980)). Accordingly, Cox's final claim is waived.

### III. Relevance of Evidence Conditioned on a Fact

At trial, Cox objected to testimony by David Puckett, a deputy prosecutor in Madison County. Puckett testified that four days before the murder he had represented the State of Indiana at a bond reduction hearing for Cox's close friend Jamie Hammer. He

---

8. Here, the sole aggravating circumstance was that Cox committed the murder by intentionally discharging a firearm into an inhabited dwelling.

*See now* IND CODE § 35-50-2-9(b)(15)(A) (Supp. 1997).

testified that: (1) he had informed the court at the hearing that three class B felony charges were to be filed against Hammer, in addition to a single pending charge, for alleged acts of child molestation of Leonard's daughter; (2) Helen Johnson, Hammer's mother, testified at the hearing; and (3) Hammer's bond was not reduced as a result of the hearing. Cox contends that this testimony was inadmissible because it could be relevant only if Cox knew what happened at the hearing and the State was unable to prove conclusively that Cox had that knowledge. The trial court admitted the evidence, concluding that because Hammer's mother knew about the denial of Hammer's bond reduction and the additional charges to be filed, "other persons in [Hammer's] circle reasonably are likely to know about it."

The admissibility of Puckett's testimony is governed by Indiana Evidence Rule 104(b), "Relevancy Conditioned on Fact," although neither party cites this rule. The Indiana Rule is identical to Federal Rule of Evidence 104(b). It provides: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Here, the relevance of Puckett's testimony depends upon a condition of fact—whether Cox knew about what happened at the bond reduction hearing. If Cox knew of the latest developments in Hammer's case, then the information was relevant and extremely probative of the State's theory that Cox killed Leonard—the father of Hammer's victim—because of Hammer's plight. If Cox was ignorant of these developments, then Puckett's testimony would be irrelevant and unfairly prejudicial.

 We have not yet had occasion to set out the standard for questions under Rule 104(b). Under its terms, the court may admit the evidence only after it makes a preliminary determination that there is sufficient evidence to support a finding that the conditional fact exists. As Weinstein commented, "[t]hese issues are, for the most part, simple factual questions to be decided on the basis of common sense, and the Rules [of Evidence] assume that the jury is as

competent to decide them as the judge." 1 WEINSTEIN'S FEDERAL EVIDENCE § 104.30[1], at 104–63 (2d ed. 1998). We adopt the prevailing federal standard that "the judge must determine only that a reasonable jury could make the requisite factual determination based on the evidence before it." *Id.* at 104–65, n. 3. *See, e.g., United States v. Gil,* 58 F.3d 1414, 1420 (9th Cir.1995) ("[t]he court merely needs to decide that there is a substantial enough showing to present the issue to the jury for them to perform [the] weighing function" of whether the showing is strong or weak) (internal quotation marks omitted); *United States v. Beechum,* 582 F.2d 898, 913 (5th Cir.1978) (en banc) ("the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist") (internal quotation marks and citation omitted). The trial court is not required to weigh the credibility of the evidence or to make a finding. *See Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). We will review the sufficiency of the evidence under 104(b) for an abuse of discretion. *Cf. Gil,* 58 F.3d at 1419; *United States v. Ramirez,* 894 F.2d 565, 569 (2d Cir.1990). Here, the State introduced evidence that Cox spent almost every day at the Hammer house where Hammer's mother lived both before and after the bond reduction hearing and up to the time of the shooting. Hammer and Cox were close friends and Hammer's mother attended the hearing. This evidence is sufficient to support the inference that Cox had learned what transpired at the hearing. Accordingly, the trial court did not abuse its discretion by admitting the evidence.

 Cox also contends that Puckett's testimony should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. Ind.Evidence Rule 403. The thrust of Cox's contention is that the probative value of the evidence was diminished considerably because it was conditioned on Cox's knowledge of the events of the hearing. We disagree. If the fact upon which the evidence depends is too speculative, then the evidence will not be admitted under Rule 104(b). Once evi-

dence passes the 104(b) hurdle, the court then separately determines admissibility under the other rules of evidence. The speculative component of evidence conditioned on the existence of a fact may then become part of the trial court's relevance inquiry. The trial court must determine whether the evidence is of no probative value or whether its probative value is substantially decreased by its speculative component and inadmissible under Rule 402 (relevance) or Rule 403 (balancing). This is a highly fact sensitive inquiry and accordingly is reviewed for abuse of discretion. *Thompson v. State,* 690 N.E.2d 224, 233 (Ind.1997). Here, the court was well within its discretion in concluding that the evidence was both relevant and did not outweigh the danger of unfair prejudice.

## IV. Motion for Continuance

After the jury returned a guilty verdict on the murder count, Cox requested the appointment of a "mitigation investigator" to assist his preparation for the penalty phase. An identical request was denied six months before trial. This time the trial court granted the request. Sentencing was scheduled to begin eight days later on the Wednesday after the Thanksgiving holiday, leaving three business days for the mitigation investigator to prepare. The court said that the investigator "can be engaged, and she can do what you've described over the next few days and pull together some things to help you do your job better on Wednesday, that's fine. If she is unable to do that, then you are welcome ... to use [the factual investigator] to do some of the things that we talked about." The court also set a general limit on the amount of money to be spent. Cox then told the court that he would probably file a motion for a continuance to give the mitigation investigator more time. The court said that Cox now had the mitigation and factual investigators available and if they were unable to accomplish everything he intended the continuance would probably not be granted. Two days before sentencing, Cox filed a motion for a continuance. The court held a hearing on the motion the morning the penalty phase was set to begin. At the hearing, the mitigation investigator testified that she had obtained and reviewed Cox's school and

hospital records. She testified that in her opinion as a lay person, expert neurological testing of Cox was required to check for brain damage. Based on her testimony, Cox contended that a continuance of fifteen days and court supplied funds were needed to hire neurological experts to perform certain tests and to prepare to testify. The trial court denied both the motion for a continuance and the request for funds. Cox contends that this was reversible error.

■■■■■ Last minute continuances are not favored and we review the trial court's ruling for an abuse of discretion. *Wine v. State,* 539 N.E.2d 932, 935 (Ind.1989). The appointment of experts is also within the sound discretion of the trial court. *Harrison v. State,* 644 N.E.2d 1243, 1253 (Ind.1995). A court need not appoint an expert if the request is untimely. *Scott v. State,* 593 N.E.2d 198, 201 (Ind.1992). Here, the mitigation investigator told the court that she acquired the data through a release signed by Cox, something that could have been done at any time. She admitted that her analysis of the data and her recommendation were not those of an expert and there was only the possibility in her lay opinion that an expert would produce anything relevant. The trial court pointed out that Cox had over a year to obtain this data and that counsel was as qualified as the mitigation investigator to assess the data for purposes of requesting expert testing. The court noted that after it had denied Cox's original request for a mitigation investigator Cox faced a strategic decision: whether to conduct mitigation investigation without a court appointed investigator or to hope that a later request for assistance would be granted. Cox apparently chose not to investigate when there was still ample time to do so, but chose to wait until days before sentencing. Further, the court had granted Cox's request to have other investigative assistance available to him throughout the trial. Under these circumstances, the trial court did not abuse its discretion in denying the motion for a continuance and the request for funding to hire a neurological expert, or the request for more time for the mitigation investigator to complete work that, at least in significant part, the trial

court concluded could have been done by counsel in the several months preceding trial.

Finally, in a conclusory sentence, with no elaboration, Cox contends that failure to present at the sentencing hearing information the mitigation investigator did uncover constituted ineffective assistance of counsel. Without any showing as to what this was, or what the pros and cons of presenting it might have been, we cannot evaluate this claim. Accordingly, Cox has failed to carry his burden on this issue.

### Conclusion

We affirm the trial court.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.