Teresa Kay COX, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 83A01–0501–CR–14.

Court of Appeals of Indiana.

Oct. 10, 2006.

---

Thomas M. Thompson, Thompson Law Office, Connersville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Appellant, Teresa Kay Cox, was convicted of one count of Murder, a felony.[1] Upon appeal, Cox presents three issues for our review, which we restate as:

I. Whether the trial court erred in admitting into evidence testimony regarding statements made by Cox during a custodial interrogation by the police;

II. Whether the trial court erred in admitting into evidence testimony that Cox had lost physical custody of two of her children; and

III. Whether the prosecutor's comments during the State's closing argument amounted to prosecutorial misconduct.

We affirm.

The facts most favorable to the jury's verdict reveal that in 2001, Cox was dating Scott Williams. In September of 2001, Williams underwent surgery for a blood clot in his brain. After surgery, Williams suffered from physical disabilities, including loss of balance, tremors in his arms, memory loss, and speaking difficulties. Indeed, Williams was described as appearing like someone who had suffered a stroke. After the surgery, Williams lived with his mother, Carolyn Brown.

On December 23, 2001, Cox gave birth to a daughter, S.C. Cox did not bring S.C. to visit with Williams, the presumed father. In June of 2003, Williams filed a petition to establish paternity of S.C. Ultimately, in October of 2003, DNA tests confirmed that Williams was in fact the father of S.C. Williams, with the assistance of an attorney representing him in the paternity case, sought visitation with S.C., but Cox would not permit the child to see Williams. In November of 2003, Williams filed a petition to modify, seeking custody of S.C. Cox desired a custody evaluation, to which Williams agreed. Still, however, Cox would not permit Williams to visit with S.C. and petitioned the court to set a hearing on the matter. As discussed below, Cox had previously lost a custody battle with her ex-husband and did not have custody of her two older children.

Sometime in October or November of 2003, Cox went to the house of Tammy Hoggatt, where she stated that she was looking for an individual named Shawn Cogan. Cox complained that Cogan had "ripped her off" of approximately eight hundred dollars by failing to "take care of" Williams. Tr. at 839–40. Cox even asked Hoggatt if she would be interested in "taking care" of Williams. Tr. at 840. Although Hoggatt initially thought Cox meant that she wanted Williams beaten up, she eventually concluded that Cox wanted Williams dead so that Cox would "never

---

1. Ind.Code § 35–42–1–1 (Burns Code Ed. Repl.2004).

have to worry about him being around [S.C.] again." Tr. at 842.

Also around November of 2003, Cox told Harvey Eslinger that she was having a custody battle with Williams and that she wanted him to help her "get rid" of or "eliminate[ ]" Williams before the custody hearing. Tr. at 723. Cox told Eslinger that she "didn't care how it was done, just as long as it was done." Tr. at 725. Eslinger needed money, so he told Cox that he could help her. Cox gave Eslinger $200, and he told her that he would try to find someone that could "help her with her problem." Tr. at 726. According to Eslinger, he told Cox that he was unable to find someone to "help" her. When interrogated by Sheriff Kim Hawkins, Cox claimed that she had talked to Eslinger about her problems with Williams, and that Eslinger told her that he knew someone who would "take care of" Williams for her. Tr. at 917. Cox told Sheriff Hawkins that she loaned Eslinger $200, but that she later told Eslinger that she could not follow through with the plan. In addition to Hoggatt and Eslinger, Cox also told Kevin Beeler about her problems with Williams, and Beeler offered to "help her out of her problems" by making Williams "disappear." Tr. at 924.

On March 9, 2004, the court issued a visitation order to begin March 13, granting Williams visitation in accordance with the Indiana Parenting Time Guidelines. The order did provide that Williams's visitations would be supervised for the first thirty days. Despite the order, Williams was still denied visitations, and he and Cox disagreed as to the meaning of the court's requirement that visitation be supervised for the first thirty days. A final custody hearing was scheduled to take place on May 21, 2004.

Around March of 2004, Cox began to date Jeremy Schmitt. Schmitt had recently moved and had no steady job or income at the time. Cox told Schmitt about her problems with Williams regarding custody of S.C. On April 16, 2004, Cox, Schmitt, and S.C. went to an automobile dealership, where Cox informed the salesman that she was going to buy a truck for Schmitt. Schmitt test drove two vehicles that day: one costing approximately $23,000 and the other approximately $29,000. Cox indicated that she would pay for the vehicle in cash. The following day, Cox and Schmitt looked at Honda four-wheel vehicles, and Cox bought Schmitt a shirt and pair of athletic shoes.

On the evening of April 17, 2004, Cox asked Schmitt if he could "create an entrance into someone's home." Tr. at 986. Schmitt, who testified that he had done so before, responded that "getting into a house is not a problem." Tr. at 986. Schmitt told Cox that he would need a "pry bar" to gain entry. Tr. at 987. The next day, Cox told Schmitt that she wanted to break into Williams's house. According to Schmitt, Cox said that she had "someone arranged to be there to intimidate or scare Mr. Williams." Tr. at 988.

At approximately 5:10 a.m. on April 19, 2004, Williams's mother, with whom Williams lived, left for work. When she left, her son was still in bed asleep, and both of the doors to the residence were locked. That same morning, Cox and Schmitt drove in a truck to St. Bernice, where Williams and his mother lived, and parked by an abandoned home near Williams's home. Cox gave Schmitt a crowbar which he then used, along with a pocket knife, to open a window in the back of Williams's home. Schmitt climbed through the window, saw Williams asleep in his bed, and unlocked and opened the back door to let Cox in. Cox asked Schmitt for the crow bar, which he gave to her, and Cox entered the home. Cox was wearing a ski mask and what appeared to

be surgical gloves. As Schmitt left the home, he heard a man's voice say "get the f* * * out of my house...." Tr. at 1006. Schmitt returned to the truck and smoked a cigarette. Approximately ten minutes later, Cox returned to the truck and seemed "flustered" or "stressed." Tr. at 1007. She had what appeared to be blood on her clothes and was shaking. Cox removed her hat, shirt, gloves, and shoes, and put them into a trash bag along with the crowbar. Cox drove to her father's house where she disposed of the trash bag. Cox telephoned Schmitt later that day and told him that she had cleaned the interior of her car at a car wash.

Williams's mother returned home from work shortly after 1:00 p.m. and found her son lying dead on the floor of his bedroom. According to the autopsy results, Williams had been struck in the head over twenty times by an object which caused "chop wounds" and fractured his skull. Tr. at 448. Williams also suffered defensive wounds to his hands and forearms. Williams had died as a result of the injuries to his head. The police spoke with Cox the day of the murder, but she was not arrested.

The following day, April 20, 2004, Sheriff Hawkins interrogated Cox, who admitted talking to Eslinger about her problems with Williams. Cox claimed that Eslinger offered to kill Williams, but that she could not go through with such a plan. Cox was arrested after giving her statement, and was ultimately charged on April 22, 2004 with conspiring with Eslinger to kill Williams in Cause No. 83C01–0404–FA–01 ("Cause FA–01"). On April 24, 2004, Cox, while still in jail, asked to speak with Sheriff Hawkins. Cox still denied responsibility for Williams's death. On April 28, 2004, the State charged Williams under

Cause No. 83C01–0404–MR–01 ("Cause MR–01") with murdering Williams and conspiring with Schmitt to murder Williams. On April 30, 2004, the causes were consolidated for trial upon Cox's motion.

On September 9, 2004, Cox filed a motion to suppress her statements to police, and on September 20, 2004, she filed an amended motion to suppress. The trial court held a hearing on Cox's motion on September 21, 2004 and entered an order denying the motion on September 27, 2004. A jury trial commenced on October 5 and concluded on October 14, 2004. On the last day of trial, the jury found Cox not guilty of the charge under Cause FA–01, i.e. conspiracy to commit murder with Eslinger, but found her guilty of both charges under Cause MR–01. At a sentencing hearing held on November 14, 2004, the trial court vacated Cox's conspiracy conviction upon double jeopardy grounds and sentenced Cox only upon the murder conviction.[2] The court found that the aggravating factors outweighed the mitigating factors, enhanced the presumptive fifty-five year sentence by ten years, and imposed the maximum sixty-five year sentence. Cox filed a notice of appeal on December 8, 2004.

**I**

Cox argues that the trial court erred in admitting into evidence the statements she made to Sheriff Hawkins during the interrogations which occurred on April 20 and 24, 2004. We note that the videotapes of the interrogations were not admitted into evidence; instead, Sheriff Hawkins testified as to what Cox had said during the interrogations. Cox claims that her statements should have been excluded because

---

**2.** In doing so, the court expressed concern that the jury may have relied upon the same evidence, i.e., driving the truck to the scene,

to establish both conspiracy and murder as an accomplice.

the interrogations amounted to a deprivation of her right to remain silent and right to counsel as guaranteed by the Federal and State Constitutions.[3]

■ The question of whether to admit evidence is within the sound discretion of the trial court. *Kelley v. State*, 825 N.E.2d 420, 424 (Ind.Ct.App.2005). Further, our standard of review of rulings on the admissibility of evidence is effectively the same whether the challenge is made by a pretrial motion to suppress or by a trial objection. *Burkes v. State*, 842 N.E.2d 426, 429 (Ind.Ct.App.2006), *trans. denied.* We consider the evidence most favorable to the court's decision and any uncontradicted evidence to the contrary. *Id.; see also Kelley*, 825 N.E.2d at 426 (when ruling upon the admissibility of evidence at trial, the court should consider evidence from a motion to suppress hearing which is favorable to the defendant and which has not been countered or contradicted by foundational evidence offered at trial).

Cox claims that at the beginning of the interrogation which occurred on April 20, 2004, she invoked her right to counsel, and thus Sheriff Hawkins's continued interrogation was in violation of both her right to remain silent under the Fifth Amendment as explained in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and her right to counsel under the Sixth Amendment.

■ With regard to Cox's Fifth Amendment claim, we observe that the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall be compelled in any criminal case to be a witness against himself. *See King v. State*, 844 N.E.2d 92, 96 (Ind.Ct.App.2005). To protect this privilege against self-incrimination, the *Miranda* Court held that a person who has been taken into custody or otherwise deprived of his freedom of action in any significant way must, before being subjected to interrogation by law enforcement officers, be advised of his rights to remain silent, to have an attorney present during questioning, and be warned that any statement made may be used as evidence against him. *Id.* (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). Statements elicited in violation of this rule of law are generally inadmissible in the defendant's criminal trial. *Id.* Waiver of the defendant's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging an understanding of them, proceeds to make a statement without taking advantage of those rights. *Morales v. State*, 749 N.E.2d 1260, 1266 (Ind.Ct.App.2001). In addition to the required *Miranda* advisement, the defendant's self-incriminating statement must also be voluntarily given. *Id.* In judging the voluntariness of the defendant's waiver of rights, we look to the totality of the circumstances to ensure that the defendant's self-incriminating statement was not induced by violence, threats, or other improper influences that overcame her free will. *Id.* The State bears the burden of proving beyond a reasonable doubt that the defendant voluntarily and intelligently waived her rights, and that

---

**3.** Cox mentions Sections 13 and 14 of Article 1 of the Indiana Constitution, but does not develop a separate and independent argument regarding these provisions. Indeed, Cox cites but one case in which an independent analysis of the Indiana Constitution is undertaken. *See Malinski v. State*, 794 N.E.2d 1071 (Ind. 2003). Cox cites to *Malinski* without any explanation as to why the Indiana Constitution would require a different outcome. We therefore address only her arguments regarding the Fifth and Sixth Amendments to the United States Constitution. *See Taylor v. State*, 717 N.E.2d 90, 93 n. 4 (Ind.1999) (arguments under Indiana Constitution waived where defendant failed to provide independent argument of state constitutional claims).

the defendant's confession was voluntarily given. *Id. See also Crain v. State,* 736 N.E.2d 1223, 1230 (Ind.2000).

 Here, with regard to the interrogation which occurred on April 20, Sheriff Hawkins initially began to advise Cox of her *Miranda* rights. As Sheriff Hawkins advised Cox of her right to remain silent, Cox interrupted him and informed him that she had an attorney who represented her in the child custody dispute with Williams. According to Cox's statement to Sheriff Hawkins, this attorney was married to a "criminal attorney." State's Exh. C. Cox then went off on a tangential discussion of reporters being at her house, but when she got back to the subject of her attorney, she said she had been told "not to talk to nobody [sic], at all, period." *Id.* Immediately after saying this, however, Cox stated, "but I'm OK to do this because I'm innocent of everything, so I have nothing to worry about." *Id. See also* Tr. at 111–12.

 We agree with the State that during the April 20 interrogation, Cox did not invoke her right to counsel. Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. *Morgan v. State,* 759 N.E.2d 257, 261 (Ind.Ct.App.2001); *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). In contrast, if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, cessation of questioning is not required. *Davis,* 512 U.S. at 459, 114 S.Ct. 2350. Although Cox mentioned her attorney in the child custody matter and that she had been advised not to speak with anyone, she immediately said thereafter that she would talk, claiming innocence. We are simply unable to say that this amounts to an invocation of *Miranda* rights.

We find support for our conclusion in *Haviland v. State,* 677 N.E.2d 509, 511 (Ind.1997), where the defendant claimed that his statement of "I'm through with this," during police interrogation meant that he wanted the questioning to stop. Upon direct appeal, our Supreme Court upheld the trial court's determination that this statement was not an invocation of Fifth Amendment rights. *Id.* at 514–15. The court noted that Haviland appeared only to be "through" with hearing that he had killed the victim, not through with questioning. *Id.* at 514. When the interrogator asked Haviland what he meant, Haviland responded by stating, "I said I'm through with it. I didn't kill nobody, you keep insisting I did and I didn't." *Id.* Importantly, Haviland made no effort to remain silent or not respond, but instead he answered questions without pausing or indicating in any manner that he would not respond. *Id.* "He answered the detective's questions by saying he did not do the crime, then continued talking." *Id.*

We are faced with a similar situation in the present case. Cox mentioned an attorney and that she had been told not to speak, but also immediately thereafter claimed innocence and said she had nothing to worry about. Sheriff Hawkins then read to Cox her *Miranda* rights, and she signed the waiver portion of the written waiver and answered Sheriff Hawkins's questions. We therefore conclude that Cox simply did not invoke her right to remain silent or to counsel under *Miranda. See id.; see also Davis,* 512 U.S. at 462, 114 S.Ct. 2350 (defendant's statement that "maybe I should talk to a lawyer" was held not to be a request for

counsel under *Miranda); Taylor v. State,* 689 N.E.2d 699, 703 (Ind.1997) (defendant's statement of "I guess I really want a lawyer, but, I mean, I've never done this before so I don't know" held to be an expression of doubt, not a request for counsel under *Miranda* ).

We also reject Cox's claim that her interrogation was in violation of her Sixth Amendment right to counsel. As explained by our Supreme Court in *Dullen v. State,* 721 N.E.2d 241, 242 (Ind.1999), *cert. denied,* 531 U.S. 847, 121 S.Ct. 118, 148 L.Ed.2d 73 (2000), "It is well settled that the Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against the defendant. Once charges are filed against a defendant, the Sixth Amendment guarantee of assistance of counsel applies to 'critical' stages of the proceedings" (citation omitted). In the present case, the first charges against Cox were not filed until April 22, 2004, two days after the interrogation.[4] Cox's Sixth Amendment right to counsel was thus not implicated by the April 20, 2004 interrogation. Moreover, at least in the setting of a custodial interrogation, where a defendant speaks with police after being admonished with the *Miranda* warnings, a waiver of

the Sixth Amendment right to counsel will be held to be valid.[5] *See Patterson v. Illinois,* 487 U.S. 285, 296, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) ("an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."); *see also Poynter v. State,* 749 N.E.2d 1122, 1128 n. 7 (Ind.2001) (noting that a *Miranda* advisement of rights may not be enough to constitute a knowing and valid waiver of Sixth Amendment rights in a setting outside of custodial interrogations).

Cox also claims that the trial court erred in permitting Sheriff Hawkins to testify with regard to any statement she made during the interrogation which occurred on April 24, 2004, after Cox had already been arrested and charged with conspiring with Eslinger to kill Williams in Cause FA–01. Cox again claims that she invoked her right to counsel and that Hawkins's continued questioning violated both *Miranda* and the Sixth Amendment. The State claims, and our review of the record confirms, that the State did not introduce

4. In the "Nature of the Case" portion of her brief, Cox states that charges in Cause FA–01 were filed against her on April 20, 2004. *See* Appellant's Br. at 2. However, in the "Statement of Facts" portion of her brief, Cox states that charges in Cause FA–01 were filed on April 22, 2004. *See id.* at 7. In both instances, Cox cites to page 245 of the Appendix. That page of the Appendix contains a copy of Cox's motion to suppress her statements, in which she indicates that charges in Cause FA–01 were filed on April 22, 2004. Unfortunately, we are unable to locate copies of the charging information or the CCS in Cause FA–01 in the Appendix. The State's brief states that charges were not filed until April 22, and in addition to page 245 of the Appendix, cites to page 121 of the Transcript, which records the hearing held on Cox's motion to

suppress. On that page of the Transcript, Sheriff Hawkins agreed with the statement by Cox's trial counsel that the information alleging a conspiracy between Cox and Eslinger was filed on April 22, 2004. Although we would prefer to have been provided with copies of the charging information and CCS in Cause FA–01, we presume that the isolated reference to charges being filed on April 20 is simply a typographical error.

5. We further note that the April 20 interrogation concerned Cox communicating with Eslinger about her desire to kill Williams, i.e. the conspiracy alleged in Cause FA–01. Even if it were error to admit the evidence regarding Cox's statements, such error would likely be harmless because Cox was ultimately acquitted of the charge in Cause FA–01.

any testimony or other evidence regarding any statements made by Cox during the interrogation which occurred on April 24. Therefore, regardless of whether the interrogations were conducted in violation of Cox's Fifth and Sixth Amendment rights, there could be no reversible error because the allegedly improper evidence was not introduced at trial.

## II

■■■ Cox claims that the trial court erred in permitting a witness to testify with regard to the fact that she had lost physical custody of her two older children. Cox claims that the admission of this evidence violated Indiana Evidence Rules 403 and 404(b). We are reminded that evidentiary decisions are within the discretion of the trial court. *Kelley*, 825 N.E.2d at 424. Indiana Evidence Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Indiana Evidence Rule 404(b) states that:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

This rule is designed to prevent the jury from making the "forbidden inference" that prior wrongful conduct suggests present guilt. *Barker v. State*, 695 N.E.2d 925, 930 (Ind.1998).

Here, Cox specifically complains of the testimony of Jon Spurr, the attorney who represented Williams in the custody dispute with Cox. Mr. Spurr testified that he thought Williams had a strong case for custody of his child because Cox had previously lost custody of her two older children to her ex-husband. Cox claims upon appeal that "[e]vidence pertaining to the 1998–1999 divorce obviously could not constitute evidence that the Defendant had the intent to murder Scott Williams, plan to have Scott Williams murdered, or have a motive to kill Scott Williams, due to a fear of losing custody of a child who was not yet born [at the time of the earlier custody dispute]." Appellant's Br. at 19. The State notes that other witnesses besides Mr. Spurr touched upon the issue of the custody of Cox's two older children. Indeed, during Cox's case-in-chief, she called as a witness Mary Pierce, the attorney who had represented her during the custody dispute with Williams. Ms. Pierce testified that it was her opinion that Cox would have prevailed in the custody dispute with Williams and had advised Cox of her opinion. Upon cross-examination, the State, over Cox's objection, elicited testimony from Ms. Pierce that although she did not initially know anything about Cox's prior custody case, she did eventually learn that Cox's ex-husband had physical custody of Cox's two older children but that she knew no details about that case. The State also notes that Cox called as a witness her ex-husband, Philip Cox, who testified without objection upon cross-examination by the State that he had custody of his children.

■■■ The State argues that evidence of Cox's prior custody dispute was relevant to the issue of her motive to kill Williams, i.e. because Cox had lost a custody dispute with her ex-husband, she feared losing custody of her current child to Williams, so she had Williams killed. We agree that the evidence in question was properly admissible as relevant evidence of Cox's motive. Evidence of motive, though not required, is always relevant in the proof of a crime. *Wilson v. State*, 765 N.E.2d 1265,

1270 (Ind.2002). Here, the State's theory of the case was that Cox wanted Williams dead so that he could not win custody of their child. The fact that Cox had not won custody of her two older children in the custody dispute with her ex-husband is relevant to show that she feared that what had happened before, i.e. losing custody, would happen again. If evidence is offered to prove motive instead of proving action in conformity with the "prior bad act," it does not run afoul of Rule 404(b). *See, e.g., Herrera v. State*, 710 N.E.2d 931, 936–37 (Ind.Ct.App.1999) (evidence of a murder which was the subject of another prosecution against defendant was relevant to explain his motive in the current trial for conspiring to murder witnesses who were testifying against him in prior case).

■ Moreover, we cannot say that the relevancy of this evidence was substantially outweighed by the danger of unfair prejudice to Cox. Indeed, as explained below, the details of the prior custody battle were never explored. The fact that a parent was not awarded custody of his or her children during a divorce is not necessarily evidence which would be unfairly prejudicial. This is especially so in the present case, where Cox's fitness as a custodial parent was not at issue.

■ Lastly, even if we were to agree with Cox that the trial court erroneously admitted this evidence, such would not require reversal. Errors in the admission of evidence will not result in reversal if the error is harmless, i.e., if the probable impact of the evidence upon the jury is sufficiently minor so as to not affect a party's substantial rights. *Holden v. State*, 815 N.E.2d 1049, 1054 (Ind.Ct.App. 2004), *trans. denied; see also* Ind. Evidence Rule 103(a) (stating that error may

not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected). Here, Mr. Spurr simply testified that Cox previously lost custody of her two older children and Ms. Pierce testified upon cross-examination by the State that Cox's ex-husband had been awarded physical custody of the children.[6] Mr. Spurr did not go into any detail as to why Cox lost custody of the children, and Ms. Pierce did not know the details of that case and did not testify as to such. Further, one of the witnesses Cox called, her ex-husband Philip Cox, testified without objection that his children with Cox were "in [his] custody." Tr. at 1084. Nowhere in the complained-of testimony was the jury exposed to details of the custody battle or precisely why Cox's ex-husband was awarded custody. These brief, non-detailed references, which as the State notes form a few lines of a seven-volume transcript, were unlikely to impact the jury in such a manner as to affect Cox's substantial rights. This is especially so given Schmitt's testimony regarding Cox's role in Williams's death. *See Holden*, 815 N.E.2d at 1054 (any error in admission of evidence regarding uncharged robbery was harmless where the testimony regarding such was brief and phrased so that the information elicited established that investigation of that robbery led to the discovery of the gun used in the charged robbery). In short, the trial court did not err in admitting evidence regarding the fact that Cox had lost custody of her two older children, and even if it did err, such error would be harmless.

### III

■ Cox claims that during the State's closing argument the prosecutor referred to evidence outside the record. Cox spe-

---

**6.** From the questions of counsel, it would appear that although Cox's ex-husband had

physical custody of the children, Cox did share joint legal custody with her ex-husband.

cifically refers to the actions of the prosecutor when she put quotations made by Sheriff Hawkins on a slide projector and read the quotations to the jury. According to Cox, the quotations were taken from a transcript of Sheriff Hawkins's interrogation of Cox. The State claims that the prosecutor was not reading quotes from a transcript but simply recounting for the jury what Sheriff Hawkins's trial testimony had been with respect to what questions he had asked Cox and what her answers to those questions were. The jury eventually informed the trial court judge that it wished to see a copy of the transcript of the interrogation of Cox. After discussing the issue with the parties, the trial judge was informed that the transcript of the interrogation was never introduced into evidence at trial. Upon appeal, Cox now claims that it was error for the prosecutor to show the jury quotations from a transcript which was not introduced into evidence.

Our review of the record reveals that during the State's closing argument the prosecutor began to read from slides which were apparently quotes from Sheriff Hawkins's interrogation of Eslinger. Cox then objected to this, claiming that the tape of Eslinger's interrogation had been offered into evidence for the limited purpose of impeachment with a prior inconsistent statement. Eventually, the trial court determined that the tape had not been introduced for any limited purpose, and the prosecutor again referred to Eslinger's interrogation by Sheriff Hawkins. The prosecutor then began to reference questions posed by the Sheriff to Cox:

> "[T]he evidence of Harvey Eslinger is not as important as the evidence on this Count that you get from the Defendant's own statement. You have seen these statements before. April the 19th, 2004 was the day Scott Williams was murdered. That afternoon, the Defendant appeared at the Vermillion County Sher-

iff's Department, and that afternoon, Sheriff Hawkins conducted an interview with her. And, he said to her ... Teresa, has there ever been a time when you told any person that you would like to see Scott Williams dead ... no ... not at any time or at any place ...

> [Cox's Counsel]: And, I apologize for this, counsel, but ... is this from the testimony at trial ...

> [Prosecutor]: This is from ...

> [Cox's Counsel]: ... or is this something that is in evidence?

> [Prosecutor]: ... yes it is.

> [Cox's Counsel]: All right. Thank you.

> [Prosecutor]: *This is a statement that we had Sheriff Hawkins listen to the tape, exactly what was said, we prepared a transcript, we entered it into evidence.*

> [Cox's Counsel]: All right. Thank you. I apologize. Go ahead." Tr. at 1222 (emphasis supplied).

The prosecutor then began to read questions and answers from the April 20, 2004 interrogation of Cox by Sheriff Hawkins, and finished her closing argument without further interruption.

Later, when discussing the jury's request for a copy of the transcript of Sheriff Hawkins's interrogation of Cox, it became apparent that the transcript was not entered into evidence. When asked by Cox's counsel "Is that what you were referring to in your ... final argument," the prosecutor responded "Oh, no ... absolutely not." Tr. at 1305. This seemingly contradicts what the prosecutor stated earlier, when she claimed that the transcript had been admitted into evidence.

The State, however, correctly points out that Cox never objected to the reading of the quotations as being outside of the evidence. When the prosecutor began to read questions from Cox's inter-

rogation, Cox's counsel did ask for clarification, but seemed satisfied that the statements being read were taken from admitted evidence. Failure to object to prosecutorial comments in a timely fashion results in forfeiture of the issue upon appeal. *Cox v. State,* 696 N.E.2d 853, 860 (Ind.1998). Here, Cox did not object to the prosecutor's statements, and the issue is therefore forfeited for purposes of appeal. *See id.*

Waiver notwithstanding, and whether or not a transcript of Sheriff Hawkins's interrogation of Cox was admitted into evidence, Sheriff Hawkins testified at trial regarding the substance of what Cox said during that interrogation. Thus, this evidence was before the jury in one form, and Cox does not explain how she was prejudiced by the prosecutor's use of the slides even if, as it appears they were, taken from the transcript which was not entered into evidence. Further, the prosecutor's comments in this regard were directed toward the conspiracy charge involving Eslinger under Cause FA–01 for which Cox was acquitted. In no way, however, do we condone the prosecutor's erroneous and misleading assurances to defense counsel and the court that the transcript of the interrogation was in evidence. Nevertheless, Cox has not established reversible error with regard to the prosecutor's statements during the State's closing argument.

The judgment of the trial court is affirmed.

BAKER, J., and MAY, J., concur.