**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Sep 25 2013, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW D. ANGLEMEYER**
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| BRIAN McGILL, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 49A02-1211-CR-934 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol Orbison, Judge
Cause No. 49G22-1105-FB-30908

**September 25, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

On April 30, 2011, Appellant-Defendant Brian McGill was working security at a pea-shake house in Indianapolis that was owned and operated by his family. At some point during the evening, McGill became involved in an incident with Eric Kendrick. During this incident, McGill struck Kendrick on the left side of the face and shot Kendrick in the left knee. McGill was subsequently charged with and convicted of Class B felony aggravated battery. McGill was also found to be a habitual offender and in indirect contempt of court. He was sentenced to an aggregate term of twenty-three years, with six years suspended and the final four years served through community corrections.

On appeal, McGill raises numerous issues which we restate as follows: (I) whether the trial court abused its discretion in admitting evidence recovered from the search of McGill's residence; (II) whether the State committed prosecutorial misconduct; (III) whether the trial court abused its discretion in denying McGill's request to give surrebuttal during closing arguments; (IV) whether the trial court abused its discretion in permitting the State to belatedly amend the charging information to include the allegation that McGill is a habitual offender; and (V) whether the evidence is sufficient to sustain the trial court's determination that McGill is a habitual offender. We affirm.

**FACTS AND PROCEDURAL HISTORY**

McGill's family has owned and operated a pea-shake house on Columbia Street in Indianapolis for fifty to sixty years. A pea-shake house is an illegal gambling operation that runs a game of chance, akin to a lottery, where peas with numbers are selected from a cup to produce the winning four-digit combination. April 30, 2011, was customer appreciation day

2

at the pea-shake house. On customer appreciation day, the pea-shake house would offer free beer to attract patrons. Customer appreciation day was usually scheduled near the time that people would receive their disability payments.

On April 30, 2011, McGill was working as head of security at the pea-shake house. As head of security, McGill had no police powers. He wore a shirt denoting himself as "Security" and possessed a .32 caliber revolver, a stun gun, a night stick, pepper spray, and handcuffs.

Eric Kendrick, a left leg below the knee amputee, arrived at the pea-shake house at approximately 6:30 p.m. After arriving at the pea-shake house, Kendrick purchased his numbers. He then went outside to reminisce with acquaintances.

While outside, Kendrick spoke with one of the employees of the pea-shake house known as "Twin." Kendrick asked Twin if he could take ice from the container holding the free beer after all of the beer had been removed. Twin responded affirmatively. Once the beer was gone, Kendrick again asked Twin if he could take some of the leftover ice, and Twin again responded affirmatively.

Kendrick retrieved a bucket from his van and entered the pea-shake house to collect the ice. Kendrick encountered McGill, who was standing near the container holding the ice, and informed him that Twin had given him permission to take some of the ice. McGill told Kendrick that he was "a damn liar" and "[a]in't nobody told you you could have some ice." Tr. p. 39. McGill then offered to give Kendrick some ice in exchange for two or three dollars. Kendrick said he would not pay for the ice and attempted to leave the pea-shake

house.  McGill lunged at Kendrick before other people intervened and Kendrick was able to leave the building.

While outside, someone brought Kendrick a bag of ice.  Kendrick emptied the ice into a cooler in his van.  Kendrick remained outside and spoke with people while waiting "for the shake to come out."  Tr. p. 42.

At some point, McGill came out of the house and approached Kendrick "real fast." Tr. p. 42.  McGill confronted Kendrick, inquiring why Kendrick had told people that McGill had "made a gun play."  Tr. p. 42.  Though Kendrick had not told anyone about the "gun play," he told McGill that McGill had done so by having his hand inside of his pocket while talking to Kendrick inside the pea-shake house.  Tr. p. 42.

McGill struck Kendrick on the left side of the face with a revolver, causing the revolver to fire one round.  The impact of the blow knocked off and broke Kendrick's glasses.  McGill told Kendrick to "[g]et the hell off these people's property."  Tr. p. 44. Then, while standing approximately five to six feet away from Kendrick, McGill shot Kendrick in the left knee.  Kendrick hid between two cars and attempted to call the police on his cell phone.  After McGill fired two more shots, Kendrick fled to a Masonic Lounge that was located next door to the pea-shake house, and McGill ran from the pea-shake house.

Officer Timothy Westerhof of the Indianapolis Metropolitan Police Department responded to an emergency call that came in from the Masonic Lounge.  When Officer Westerhof arrived at the Masonic Lounge, he found Kendrick sitting in a chair in the parking lot.  Kendrick was suffering from a wound to the head and a gunshot wound to the left knee.

4

Kendrick was able to describe his shooter to Officer Westerhof and told Officer Westerhof that he knew his shooter as "Gill." Tr. p. 84. Gill was one of McGill's nicknames.

Paramedics transported Kendrick to Methodist Hospital, where he underwent emergency surgery to remove the bullet from his knee. Surgeons removed a .32 caliber bullet fragment from Kendrick's knee. Kendrick spent two to three days at Methodist. He was unable to properly attach his prosthetic leg following discharge and required "extensive physical therapy." As of the date of trial, Kendrick continued to suffer pain, and his knee would not bend the same as it did before he was shot.

A few days after Kendrick was shot, Detective Peter Perkins met with Kendrick and showed him a photographic array. In this array, Kendrick recognized Reginald McGill, another family employee at the pea-shake house who was not involved in the incident, and informed Detective Perkins that Reginald was not the shooter. The photographic array did not include a picture of McGill. Detective Perkins showed Kendrick a second photographic array which included a picture of McGill. From this second array, Kendrick identified McGill as the shooter.

At some point, police officers interviewed McGill. McGill told the officer that he had spent the entire evening of April 30, 2011, with his girlfriend at a tattoo party. He also informed the police that he did not work at the pea-shake house despite the fact that the police had discovered a pull tab ticket book on McGill when they arrested him. McGill indicated that he was unaware of the shooting until family members contacted him the following day. McGill, however, subsequently admitted that he shot Kendrick and claimed

5

that he did so in self-defense.

On May 6, 2011, the State charged McGill with one count of Class B felony aggravated battery. On May 15, 2011, McGill placed a phone call to his girlfriend from jail, during which he instructed her to give certain items to an individual known as "Tone-Bone" but to keep another item that was "on safety" in the closet for protection. Exhibits Vol. 1, p. 123. On May 18, 2011, Detective Perkins obtained a search warrant for McGill's residence, which was located at 5819 East 39th Street, after discovering the May 15, 2011 phone call. Detective Perkins executed the warrant on May 19, 2011.

During his search of McGill's residence, Detective Perkins discovered a shoebox containing ammunition, four live .32 caliber rounds on an entertainment center, and a red box containing .32 caliber ammunition behind a bar. Detective Perkins also intercepted two letters that McGill had sent to his girlfriend, in which McGill included information about Kendrick and instructed his girlfriend to do "what needs to be done" to keep Kendrick from cooperating with Detective Perkins's investigation and the upcoming criminal proceedings. Exhibits Vol. 1, p. 28.

On September 23, 2011, the State requested permission to amend the charging information to include an allegation that McGill was a habitual offender. Following an October 12, 2011 hearing on the State's request, the trial court permitted the State to file the habitual offender enhancement over McGill's objection.

On September 9, 2012 through September 11, 2012, the trial court conducted a jury trial. Just prior to the beginning of trial, McGill filed a motion to suppress the evidence that

6

was recovered during Detective Perkins's search of his residence. Upon reviewing the affidavit for probable cause and hearing argument from the parties, the trial court denied McGill's motion. During trial, the State presented evidence of McGill's guilt. McGill acknowledged that he possessed a .32 caliber revolver, stipulated to the fact that he had written the letters that had been intercepted by Detective Perkins, admitted that he initially lied to police, admitted that he made attempts to convince Kendrick not to cooperate with the police, and testified that he was acting in self-defense when he shot Kendrick.

On September 11, 2012, following the conclusion of the presentation of evidence, the jury found McGill guilty of Class B felony aggravated battery. McGill then waived the right to have the evidence relating to the habitual offender allegation heard by the jury. On October 11, 2012, the trial court heard evidence relating to the habitual offender allegation. The trial court took the matter under advisement.

The trial court conducted a sentencing hearing on October 26, 2012. During the sentencing hearing, the trial court found McGill to be a habitual offender. The trial court sentenced McGill to twelve years for the aggravated battery conviction, enhanced by ten years as a result of McGill's status as a habitual offender. The trial court ordered that six years of McGill's sentence be suspended and that the final four years of McGill's sentence be served through community corrections. The trial court also found McGill in indirect contempt of court and sentenced McGill to one year, which was ordered to be served consecutively to the rest of his sentence. This appeal follows.

**DISCUSSION AND DECISION**

7

## I. Admission of Evidence

On appeal, McGill contends that the search warrant, which authorized Detective Perkins to search his residence, was not supported by probable cause. In raising this contention, McGill effectively argues that the trial court erred in denying his motion to suppress the evidence obtained during the search of his residence. Although McGill originally challenged the admission of the evidence through a pre-trial motion to suppress, he appeals following a completed trial and thus challenges the admission of the evidence at trial. "Accordingly, 'the issue is more appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial.'" *Cole v. State*, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007) (quoting *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003)).

> Our standard of review for rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by an objection at trial. *Ackerman v. State*, 774 N.E.2d 970, 974-75 (Ind. Ct. App. 2002), *reh'g denied*, *trans. denied*. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. We also consider uncontroverted evidence in the defendant's favor. *Id*.

*Id*.

A trial court has broad discretion in ruling on the admissibility of evidence. *Washington*, 784 N.E.2d at 587 (citing *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind. Ct. App. 2001)). Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id*. (citing *Bradshaw*, 759 N.E.2d at 273). An abuse of discretion involves a decision that is clearly against the logic and effect of

the facts and circumstances before the court. *Id.* (citing *Huffines v. State*, 739 N.E.2d 1093, 1095 (Ind. Ct. App. 2000)).

## A.  Adequacy of Affidavit for Search Warrant

Again, in challenging the admission of the evidence recovered from the search of his residence, McGill contends that the search warrant, which authorized Detective Perkins to search his residence, was not supported by probable cause.  McGill challenges the search warrant under both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution.

> Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant.  *Casady v. State*, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010), *trans. denied* (citing *Mehring v. State*, 884 N.E.2d 371, 376 (Ind. Ct. App. 2008), *trans. denied*).  Probable cause is a fluid concept incapable of precise definition and must be decided based on the facts of each case.  *Id.*  In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place.  *Id.* at 1188-89.

*Smith v. State*, 982 N.E.2d 393, 404-05 (Ind. Ct. App. 2013), *trans. denied*.

> The duty of a reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed.  *State v. Spillers*, 847 N.E.2d 949, 953 (Ind. 2006).  In this sense, a "reviewing court" includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision.  *Id.*  A "substantial basis" requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause.  *Id.*  We review the trial court's substantial basis determination de novo, but we nonetheless afford significant deference to the magistrate's determination as we focus on whether reasonable inferences drawn from the totality of the evidence support that determination.  *Id.*  We consider only the evidence presented to the issuing magistrate, not after-the-fact justifications for the search.  *Casady*, 934 N.E.2d at 1189.

9

*State v. Shipman*, 987 N.E.2d 1122, 1126 (Ind. Ct. App. 2013). In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases should be resolved in favor of upholding the warrant. *Id.*

Indiana Code section 35-33-5-2 governs the appropriate information that an affidavit supporting a request for a search warrant must contain in order to justify the issuance of a valid warrant. In relevant part, Indiana Code section 35-33-5-2 provides that the affidavit must particularly describe the house or place to be searched and the things to be searched for. The affidavit must also (1) allege "substantially the offense in relation thereto and that the affiant believes and has good cause to believe that … the things as are to be searched for are there concealed;" and (2) set forth "the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause." Ind. Code § 35-33-5-2. "Thus, a probable cause affidavit is required to establish a logical connection, or nexus, between the suspect and the location to be searched." *Rader v. State*, 932 N.E.2d 755, 759 (Ind. Ct. App. 2010).

### 1. Fourth Amendment

The Fourth Amendment reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is made applicable to the states via the Due Process Clause of the

Fourteenth Amendment. *W.H. v. State*, 928 N.E.2d 288, 294 (Ind. Ct. App. 2010) (citing *Mapp v. Ohio*, 367 U.S. 643, 656 (1961)). "Evidence obtained in violation of a defendant's Fourth Amendment rights may not be introduced against him at trial." *Id.* (citing *Mapp*, 367 U.S. at 648-60).

In challenging the sufficiency of the probable cause affidavit, McGill argues that the affidavit failed to establish a sufficient nexus between the items sought and the location to be searched. Specifically, McGill claims that there was nothing in the affidavit to link the sought-after items to the residence in question. We disagree.

In *Allen v. State*, 798 N.E.2d 490 (Ind. Ct. App. 2003), we considered whether there was a sufficient nexus between certain items listed in a search warrant and the location detectives sought permission to search. The record in *Allen* revealed that officers were looking for weapons that were used in a series of murders. 798 N.E.2d at 498. Although Allen was not a named suspect, his cousin was. *Id.* The affidavit set forth that Allen was related to one of the suspects in the murders and that the suspects all admitted to having spent time in Allen's apartment. *Id.* at 498-99. The record revealed that the suspects had all spent time at the apartment after the series of murders occurred, that one of the suspects admitted to having seen a handgun in the apartment, and that the suspects kept their guns at a "safe location." *Id.* at 499. Upon review, we determined that it was reasonable for the detective to believe that the weapons could be found in the apartment and that a reasonably prudent person could make a practical, common-sense determination, given all of the circumstances set forth in the affidavit, that there was a fair probability that the weapons used in the series

11

of murders would be found at the apartment. *Id.*

> In the instant matter, the affidavit for probable cause read, in relevant part, as follows:
>
> On May 13, 2011, Brian McGill made jail phone call (317) [***]-4115 to his girlfriend Tammy Miller in that conversation Brian McGill asked Tammy to collect items from a shoebox and from behind the bar and put those in a bag have a person by the name nickname of "Tone-Bone" put those up, but to keep the item in closet for protection and that it is on safety.
> During the interview of Mr. McGill stated his address to be 5819 East 39th St[.] I'm requesting a search warrant to search the residence of 5819 East 39th Street for any evidence of firearms, ammunition or pieces of ammunition spent or non spent and any other physical evidence pertaining to this incident. One story brick residence with white trim with a detached garage with number 5819 affixed above the front door.

Exhibits Vol. 1, p. 123. Detective Perkins further averred that Kendrick had been shot in the left knee, and that Kendrick had identified McGill as the individual who had shot him. During Detective Perkins's search of McGill's residence, Detective Perkins found a .32 caliber revolver and .32 caliber ammunition, the same caliber that McGill used to shoot Kendrick.

Based upon the information presented in the affidavit, including McGill's instruction to his girlfriend to "keep the item in [the] closet for protection and that it is on safety," Exhibits Vol. 1, p. 123, we can say that it was reasonable for Detective Perkins to believe that the weapon used to shoot Kendrick could be found at McGill's residence. One could reasonably infer from McGill's instruction to his girlfriend that he was referring to a firearm of some kind, potentially the one used by McGill to shoot Kendrick. Further, to the extent that McGill claims that the affidavit could not support a finding of probable cause for the search warrant because it did not establish that the phone number that McGill called from jail

12

was the phone number at his residence, we find McGill's instructions to his girlfriend to be sufficient to support a common-sense determination that McGill was referencing items that were potentially located in his residence.

Therefore, similar to the determination in *Allen*, we conclude that a reasonably prudent person could make a practical, common-sense determination, given all the circumstances set forth in the affidavit, that there was a fair probability that the weapon used in the attack on Kendrick would be found at the residence. *See generally Allen*, 798 N.E.2d at 499. Accordingly, we reject McGill's argument that the affidavit lacked a sufficient nexus between the items sought and the location to be searched.

## 2. Article I, Section 11

Article I, Section 11 reads as follows:

> **Unreasonable search or seizure; warrant.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

The legality of a governmental intrusion under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Trotter v. State*, 933 N.E.2d 572, 580 (Ind. Ct. App. 2010) (citing *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005)). "Although there may be other relevant considerations under the circumstances, the reasonableness of a search or seizure turns on a balancing of the following: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's

13

ordinary activities, and (3) the extent of law enforcement needs." *Id.* (citing *Litchfield*, 824 N.E.2d at 361). The burden is on the State to show that under the totality of the circumstances, the police intrusion was reasonable. *Id.* (citing *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002)).

Here, Detective Perkins discovered a phone call that McGill, the suspect in the shooting of Kendrick, placed to his girlfriend from jail. In this phone call, McGill instructed his girlfriend to box up certain items and to give them to an individual known as Tone-Bone. McGill further instructed his girlfriend to leave a different item in the closet for protection. McGill indicated that the latter item was currently "on safety." Exhibits Vol. 1, p. 123. The above-stated facts relating to the affidavit for probable cause establish that Detective Perkins knew that a violation had occurred, *i.e.*, that Kendrick had been shot in the left knee, and that McGill had been identified as the shooter. As a matter of public safety and the law enforcement need to investigate the incident between Kendrick and McGill, Detective Perkins's need to find the weapon used to shoot Kendrick was great. Further, the degree of the intrusion into McGill's ordinary activities was not affected as he was already in jail. The search of his residence was limited to looking for weapons and ammunition, and nothing in the record suggests that Detective Perkins's search exceeded the scope of the warrant. In light of these circumstances, we conclude that the search of McGill's residence was reasonable.

### 3. Admission Harmless

Furthermore, even if the search warrant lacked probable cause and it was error for the

14

trial court to admit the evidence recovered from the search of McGill's residence, the admission of such evidence was harmless as it was cumulative of McGill's own testimony.

> "[E]rrors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." [*McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)]; *see also* Ind. Trial Rule 61. "In determining whether error in the introduction of evidence affected the defendant's substantial rights, this Court must assess the probable impact of the evidence upon the jury." *McClain*, 675 N.E.2d at 331. "Admission of hearsay evidence is not grounds for reversal where it is merely cumulative of other evidence admitted." *Id*. at 331-32.

*VanPatten v. State*, 986 N.E.2d 255, 267 (Ind. 2013).

In the instant matter, the evidence established that Kendrick was shot with a .32 caliber revolver. McGill testified that he carried a revolver as part of his security uniform, that the revolver was a .32 caliber revolver, and that he had fired a round from the revolver at Kendrick. In light of McGill's testimony, the admission of the .32 caliber revolver and .32 caliber ammunition recovered from McGill's residence was not overly prejudicial, but rather was merely cumulative of other evidence that was properly admitted at trial. As such, any alleged error in admitting this evidence was harmless.

## II. Prosecutorial Misconduct

McGill also contends that the State committed numerous instances of prosecutorial misconduct during trial. Specifically, McGill claims that the State committed prosecutorial misconduct by "throwing an evidentiary harpoon, vouching for the credibility of its witnesses and misstating the evidence." Appellant's Br. p. 17. We will address each claim in turn.

### A. Standard of Review

When reviewing an allegation of prosecutorial misconduct, we make

15

two inquiries. First, we determine by reference to case law and rules of conduct whether the prosecutor engaged in misconduct, and, if so, we next determine whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. *Hall v. State*, 796 N.E.2d 388, 401 (Ind. Ct. App. 2003). The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.*

*Ramsey v. State*, 853 N.E.2d 491, 498 (Ind. Ct. App. 2006), *trans. denied*; *see also Delarosa v. State*, 938 N.E.2d 690, 696 (Ind. 2010).

Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection but must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then the defendant must request a mistrial. *Neville v. State*, 976 N.E.2d 1252, 1258 (Ind. Ct. App. 2012) (citing *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)), *trans. denied*. Where a defendant does not raise a contemporaneous objection, request an admonishment, or request a mistrial where the request for an admonishment is denied or the admonishment given is insufficient to cure the error, the defendant does not properly preserve his claims of prosecutorial misconduct. *See generally Brown v. State*, 799 N.E.2d 1064, 1066 (providing that because appellant failed to request an admonishment or move for a mistrial when the trial court overruled his objection, his claim of prosecutorial misconduct was procedurally foreclosed); *Neville*, 976 N.E.2d at 1258 (providing that because appellant failed to object to the prosecutor's statements, his claim of prosecutorial misconduct was procedurally foreclosed). "To prevail on a claim of prosecutorial misconduct that has been procedurally

16

defaulted, the defendant must establish not only the grounds for the prosecutorial misconduct, but also the additional grounds for fundamental error." *Neville*, 976 N.E.2d at 1258; *see also Brown*, 799 N.E.2d at 1066.

> Fundamental error is an "extremely narrow exception" to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue. [*Cooper*, 854 N.E.2d at 835.] For a claim of prosecutorial misconduct to rise to the level of fundamental error, it must "make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm." [*Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002)] (citation, quotation marks, and brackets omitted). "The element of harm is not shown by the fact that a defendant was ultimately convicted." *Davis v. State*, 835 N.E.2d 1102, 1107 (Ind. Ct. App. 2005), *trans. denied* (2006). "Rather, it depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled." *Id*. at 1107-08.

*Neville*, 976 N.E.2d at 1258-59.

### B. Evidentiary Harpoon

McGill argues that the State committed prosecutorial misconduct by throwing an evidentiary harpoon when it allowed Detective Perkins to testify that McGill failed to complete a handwriting sample. "An evidentiary harpoon is the placing of inadmissible evidence before the jury with the deliberate purpose of prejudicing the jury against the defendant." *McDonald v. State*, 542 N.E.2d 552, 554 (Ind. 1989). In order to obtain reversal, the defendant must show that 1) the prosecution acted deliberately to prejudice the jury and 2) the evidence was inadmissible. *Jewell v. State*, 672 N.E.2d 417, 424 (Ind. Ct. App. 1996), *trans. denied*. "In order to obtain reversal, the defendant need not show that an evidentiary harpoon injured him to the extent that he would not have been found guilty but

17

for the harpooning." *Id.* (citing *Garcia v. State*, 509 N.E.2d 888, 890 (Ind. Ct. App. 1987)). "The defendant need only show that he was placed in a position of grave peril to which he should not have been subjected." *Id.*

McGill claims that Detective Perkins's testimony was not relevant because he had stipulated that he had written certain letters that were mailed to his girlfriend. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. "All relevant evidence is admissible, except as otherwise provided by the United States or Indiana constitutions, by statute not in conflict with these rules, by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible." Evid. R. 402. McGill claims that the State knew it "did not need this evidence and knew it was irrelevant to any matter requiring resolution by the jury." Appellant's Br. p. 20. As such, McGill claims that because Detective Perkins's testimony regarding his failure to complete the handwriting sample was not relevant, the only possible purpose of allowing said testimony was to show that McGill was uncooperative.

Again, an "evidentiary harpoon is the placing of inadmissible evidence before the jury with the deliberate purpose of prejudicing the jury against the defendant." *McDonald*, 542 N.E.2d at 554. "In certain circumstances, the injection of an evidentiary harpoon by a prosecutor may constitute prosecutorial misconduct rising to the level of fundamental error and requiring a mistrial." *Ramsey*, 853 N.E.2d at 499. McGill objected to the admission of

18

Detective Perkins's testimony regarding his failure to complete the handwriting sample but did not request an admonishment or mistrial when the trial court admitted Detective Perkins's testimony over McGill's objection. As such, even assuming that Detective Perkins's testimony regarding McGill's failure to complete the handwriting sample was inadmissible, McGill would be required to show that the admission of the evidence amounted to fundamental error. McGill has failed to do so.

First, McGill has failed to show that the State acted with the deliberate purpose of prejudicing the jury against him. During Detective Perkins's testimony, the State introduced two letters that McGill stipulated that he had sent to his girlfriend. In discussing the letters, the State asked Detective Perkins if he and a handwriting specialist had met with McGill to get a sample for the purpose of identifying that McGill had in fact written the letters. When Detective Perkins answered in the affirmative, the State asked Detective Perkins if McGill completed the sample. Detective Perkins indicated that he had not.

McGill claims that the State deliberately attempted to prejudice the jury against him by asking Detective Perkins whether he completed the sample. It seems likely, however, that if the State would have been acting with the deliberate purpose of prejudicing the jury against McGill, the State would have phrased the question in less neutral terms such as whether McGill "refused to complete the sample" or "refused to cooperate." Instead, the State phrased the question in neutral terms that did not frame McGill as uncooperative. The neutral phasing of the question is not such that would likely prejudice McGill, and, as a result, McGill has failed to prove that the State deliberately tried to prejudice the jury against

19

him.

Second, McGill has failed to show that the admission of Detective Perkins's challenged testimony amounted to fundamental error.  McGill stipulated that he authored and sent two letters to his girlfriend from jail.  These letters were admitted into evidence during trial.

In the first letter, McGill wrote the following:

I'm sending this info to you make copies of it make sure the picture is clear make plenty give some to Cuz to pass out anything to keep this guy from doing those 3 depositions & coming to court.  Talk to Mike he'll let you know the day he is going to do the depositions so he want be there keep him the [f***] away whatever needs to be done I got his information from in here and I don't have a vehicle a computer assets and I got this  much information on my own.
****
Now you got this info & picture what are you going to do with it?
Make sure you put it up in hiding after you made copies & gave to Cuzz …
****
Please take this shit serious get help from someone who knows what to do like Nikka /& Cuzz it's really simple …
Ask Mike Day once again to tell you the info he told me… He been trying to reach you … go to the court RM 22 & catch him  if you can't contact him ask who he is They'll show you … This is no play thing … I hope you want to start helping and taking things serious  Burn this stuff after you read it.  Hide the other info!  Put in envelope & give to Crazy to hold … Not at work & not at the house either

Exhibits Vol. 1, pp. 19-22 (Second, fourth, fifth, sixth, seventh, and eighth ellipses in original).  McGill attached a photograph of Kendrick, Kendrick's address and phone number, and documents including Kendrick's social security number.  McGill also referred to Kendrick as "one leg."  Exhibits Vol. 1, p. 24.

In the second letter, McGill wrote the following:

Get your stuff together for me to come home you are slipping out there

20

seriously! Get with Cuzz & give him those copies make sure you handle business … It is crunch time I can be home soon or never be home it's all up to you & Cuzz on doing what needs to be done Nephew will tell you how to go about things.… Stay focus I'm tired of explaining things & it is not being tooking seriously … I can behave if you listen & do what needs to be done. OR NEVER AGAIN … FORGET CRYING & START TRYING. TO GET IT DONE.

Exhibits Vol. 1, p. 28 (last ellipsis in original).

We agree with the State that "[t]he contents of the letters decimated [McGill]'s credibility in the eyes of the jury far beyond the State asking one question about whether [McGill] completed a writing sample." Appellee's Br. p. 24. The letters instructed McGill's girlfriend to do "what need[ed] to be done" to keep Kendrick from cooperating with the case against McGill and included personal information about Kendrick which McGill instructed his girlfriend to disseminate to "Cuzz" before destroying. Exhibits Vol. 1, pp. 19-24, 28. Accordingly, we cannot say, in light of the statements contained in these letters, that Detective Perkins's challenged testimony presented an undeniable and substantial potential for harm, made it impossible for McGill to receive a fair trial, or that the challenged testimony constituted clearly blatant violations of the basic and elementary principles of due process. *See Neville*, 976 N.E.2d at 1259. McGill's statements contained in the letters were far more prejudicial than any potential interpretation of Detective Perkins's challenged testimony. McGill has failed to prove that the State committed prosecutorial misconduct in this regard.

## C. Vouching

McGill also argues that the State committed prosecutorial misconduct by vouching for

21

its witnesses. In making this argument, McGill directed us toward a statement made by the deputy prosecutor during closing argument in which the deputy prosecutor said the following: "As to the investigation, this was one of the most thorough investigations I have had to present. I never had detectives going and pulling all their …". Tr. p. 236 (ellipsis in original). At this point, McGill's counsel objected, stating that "Your Honor, I am going to object to improper argument. The State is now making itself a witness by testifying." Tr. p. 236. The trial court overruled the objection, and the deputy prosecutor continued, stating:

> We had a diligent detective pulling his mail. Innocently mailed through subterfuge that he tries to get, through another inmate, into his cohort's hands. Listening to jail phone calls. Getting cell phone records.

Tr. p. 236. McGill did not request an admonishment after the trial court overruled his objection but did subsequently request a mistrial.

> It is well settled that vouching for witnesses is generally impermissible. *Lainhart v. State*, 916 N.E.2d 924, 938 (Ind. Ct. App. 2009). However, "'a prosecutor may comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence.'" *Cooper*, 854 N.E.2d at 836 (quoting *Lopez v. State*, 527 N.E.2d 1119, 1127 (Ind. 1988)). *See also Hobson v. State*, 675 N.E.2d 1090, 1095 (Ind. 1996) (prosecutor's statement "I warned you that [defendants] are liars" was not misconduct because incongruities in testimony supported inference that someone had not been testifying truthfully). In addition, an attorney may properly argue any logical or reasonable conclusions based on his or her own analysis of the evidence. *Bennett v. State*, 423 N.E.2d 588, 592 (Ind. 1981); *see also Turnbow v. State*, 637 N.E.2d 1329, 1334 (Ind. Ct. App. 1994) ("A prosecutor may also properly comment on the evidence presented to the jury and argue logical conclusions from that evidence.") *trans. denied*.

*Neville*, 976 N.E.2d at 1260 (brackets in original).

In *Neville*, the appellant argued that the prosecutor improperly vouched for the

credibility of the State's witnesses during closing argument by describing one witness as "courageous" and another as "one of the 'good people.'" *Id.* Neville further alleged that the prosecutor told the jury that a witness "told you the truth" and stated that she had been "especially corroborated." *Id.* The prosecutor also indicated that the crime scene technician who worked at the crime scene was "very good at what she does." *Id.* Upon review, this court determined that the record demonstrated that the prosecutor's comments did not amount to improper vouching because the statements were supported by the evidence and were consistent with the prosecutor's analysis of the evidence and theory of the case. *Id.* at 1260-61.

As in *Neville*, our review of the record in the instant matter shows that the deputy prosecutor's comments were supported by the evidence. The evidence indicated that Detective Perkins completed what could reasonably be described as a thorough investigation. In completing his investigation, Detective Perkins pulled McGill's mail and, after McGill's ability to mail letters himself was cut off, discovered that McGill was using another inmate to mail letters to his girlfriend. Detective Perkins also listened to the phone calls McGill made from jail and recovered McGill's cell phone records. McGill does not claim that Detective Perkins acted outside of the scope of his powers as the investigating detective but, rather, merely claims that the deputy prosecutor vouched for Detective Perkins's testimony by stating that the investigation completed by Detective Perkins was one of the most thorough that the deputy prosecutor had ever had to present to a jury.

Similar to the prosecutor's statements about the evidence technician in *Neville*, the

23

deputy prosecutor attempted to demonstrate the thorough nature of Detective Perkins's work through reliance on the evidence. Because the deputy prosecutor's statements were supported by the evidence, the statements did not amount to improper vouching, and McGill has failed to prove that the State committed prosecutorial misconduct in this regard. *See generally id*. at 1261.

Furthermore, even if McGill would have established that the deputy prosecutor's statement amounted to improper vouching, McGill has failed to establish that the deputy prosecutor's statement placed him in a position of grave peril. The instant matter is easily distinguishable from this court's opinion in *Gaby v. State*, 949 N.E.2d 870, 881 (Ind. Ct. App. 2011), in which the prosecuting attorney was found to have vouched for the victim's credibility during closing argument. In this case, the deputy prosecutor did not comment on Kendrick's credibility and provided evidentiary support for his statement that Detective Perkins conducted a thorough investigation. McGill claimed to have acted in self-defense when he shot Kendrick. However, McGill has failed to establish that the deputy prosecutor's comment regarding the thorough nature of Detective Perkins's investigation had any bearing whatsoever on the jury's determination that Kendrick's testimony regarding the circumstances that led to Kendrick getting shot was more credible than McGill's testimony about the incident.

### D. Misrepresentation of Evidence

McGill also argues that the State committed prosecutorial misconduct by misrepresenting the evidence during closing argument.

24

> We observe that "[i]t is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence. That said, a prosecutor's comments can be prejudicial if they have an impact on the jury's ability to judge the evidence fairly." *Steinberg v. State*, 941 N.E.2d 515, 531 (Ind. Ct. App. 2011), *trans. denied* (citations, quotation marks, and brackets omitted). Prosecutors may not argue facts not in evidence. *Spangler v. State*, 498 N.E.2d 1206, 1209 (Ind. 1986).

*Neville*, 976 N.E.2d at 1261.

McGill claims that the deputy prosecutor misrepresented the evidence by making the following statement: "The defense argued that the detective didn't interview witnesses who were at the scene and all he said was that they wouldn't cooperate. They were all his family. Of course, they weren't going to cooperate with the police." Tr. p. 236. McGill's counsel objected to this statement on the grounds that there was no evidence that everyone at the pea-shake house was related to McGill. The trial court overruled McGill's objection. McGill did not request an admonishment after the trial court overruled his objection but did subsequently request a mistrial. On appeal, McGill argues that the deputy prosecutor's statement amounts to a misrepresentation of the evidence because the record showed that he was not related to all potential witnesses who were present outside the pea-shake house on the night the incident took place.

For its part, the State claims that, while it may be true that not everyone present at the pea shake house on the night of the incident was related to McGill, Detective Perkins did not visit the location that night but rather returned to the pea-shake house on a later date. On that date, no one at the pea-shake house was willing to cooperate with Detective Perkins. The State asserted that the evidence demonstrated that the pea-shake house had been owned and

operated by McGill's family for fifty to sixty years. The State argues that from this evidence, one could logically infer that those present at the pea-shake house on the later date were likely related to McGill.

Further, even if the deputy prosecutor's comment did amount to a misrepresentation of the evidence, McGill has failed to establish that the deputy prosecutor's statement placed him in a position of grave peril. Again, McGill admitted to shooting Kendrick. Both Kendrick and McGill testified at trial and presented their own version of what took place on the night in question. The evidence demonstrated that Kendrick's version of the events had been consistent throughout the pendency of the criminal proceedings, while McGill admitted that he had lied to law enforcement on multiple occasions. The jury considered both McGill's and Kendrick's testimony and found Kendrick's description of the incident to be credible. In light of McGill's admission that he shot Kendrick and both McGill's and Kendrick's testimony at trial, McGill has failed to establish that the jury considered the deputy prosecutor's statement regarding McGill's relation to the potential witnesses, much less that any potential reliance on the statement by the jury placed him in grave peril. As such, we conclude that McGill has failed to establish that the State committed prosecutorial misconduct in this regard.

### III. Denial of Request for Surrebuttal

McGill next contends that he was entitled to surrebuttal because the State's final section of closing argument raised an additional point, *i.e.*, motive to lie, that was not raised in the first part of the argument. The State, for its part, argues that McGill waived this

argument on appeal.

> "Failure to object to prosecutorial comments in a timely fashion results in waiver." *Cox v. State*, 696 N.E.2d 853, 860 (Ind. 1998) (relying on *Cox v. State*, 475 N.E.2d 664, 670 (Ind. 1985)). "An objection to prosecutorial comments is untimely when raised after the State has concluded its final argument." *Cox*, 696 N.E.2d at 860 (relying on *Cleary v. State*, 663 N.E.2d 779, 782 (Ind. Ct. App. 1996) (citing *Pavone v. State*, 273 Ind. 162, 167, 402 N.E.2d 976, 979 (1980)).

*Jones v. State*, 825 N.E.2d 926, 932 (Ind. Ct. App. 2005), *trans. denied*.

Although he objected numerous times to other portions of the State's closing argument, McGill did not object to the deputy prosecutor's comments regarding motive to lie during the State's closing argument. The following exchange occurred after the State concluded its closing rebuttal argument:

> [Defense Counsel]: Judge, may we approach?
> [The Court]: You may.
> [Defense Counsel]: Judge we are asking to re-open argument that the State got in to new evidence as far as motive to lie. I never mentioned that in my argument and the State brought it up for the first time in rebuttal. We would like a chance to address that under Jury Rule 27.
> [The Court]: Address what?
> [Defense Counsel]: They got into the fact that (inaudible) had a motive to lie. I did not mention that in my closing argument so I would like a chance to address that outside the presence of the jury.
> [The Court]: Denied.

Tr. p. 239. McGill did not request a surrebuttal until after the State had concluded its closing rebuttal argument. Accordingly, McGill's claim is waived. *See Jones*, 825 N.E.2d at 932 (providing that appellant waived argument regarding surrebuttal because appellant did not request a surrebuttal until after the State had concluded its closing rebuttal argument).

Waiver notwithstanding, we will address McGill's argument. McGill argues that the

27

prosecuting attorney made an additional point regarding motive to lie in the State's final section of closing argument that was sufficient to warrant McGill's defense counsel to make additional argument. "The conduct of final argument is within the trial court's discretion." *Hughes v. State*, 508 N.E.2d 1289, 1299 (Ind. Ct. App. 1987). Indiana Code section 35-37-2-2(4) provides, in pertinent part:

> If the case is not submitted without argument, the prosecuting attorney shall have the opening and closing of the argument. However, the prosecuting attorney shall disclose in the opening all the points relied on in the case, and if in the closing he refers to any new point or fact not disclosed in the opening, the defendant or his counsel may reply to that point or fact, and that reply shall close the argument of the case.

Similarly, Indiana Jury Rule 27, describing "final arguments," explains in part:

> If the parties argue the case to the jury, the party with the burden of going forward shall open and close the argument. The party which opens the argument must disclose in the opening all the points relied on in the case. If, in the closing, the party which closes refers to any new point or fact not disclosed in the opening, the adverse party has the right to reply to the new point or fact. The adverse party's reply then closes the argument in the case.

McGill argues that the State mentioned motive to lie for the first time in the final section of its closing argument. The State, for its part, argues that it mentioned motive to lie in the first part of its closing argument.

The record shows that the State mentioned the fact that Kendrick did not have a motive to lie in the first part of its closing argument. During the first part of its closing argument, the deputy prosecutor stated the following:

> If this was self defense, [McGill] would have told the detective that. Some interesting things about the defendant's testimony when you are looking at weighing the testimony of these two. First of all, to believe the defendant you have to disregard Eric Kendrick, and that is a tall order, because what possible

28

motive would he have to go through this process, and come in here and testify, and completely make up some story? It just doesn't make sense. The statements he said today are the same that he has stated since the beginning, telling you what happened on April 30. The defendant, on the other hand, says it was self defense but admits to stepping outside and approaching him and here we have the victim who is waving a gun around outside and there are people around and nobody is interested in calling the police or concerned that this might be a problem? … So what does he do? Approaches him? Fires warning shots then shoots him. And then what does he do after that? According to his testimony, he flees the scene and hides the gun in a car that is not his. And by the way, where is this gun that Eric Kendrick had? He got shot in the leg and then went up to the Lodge where he called the police. Where did this gun go? It doesn't make any sense because it is not true. This is not a self defense case. It is not. It is just not. And the defendant is pushing your limits on how much you are willing to buy. He is pushing your limits and he is asking you for quite a bit. He is asking you for quite a bit. During the pendency of this case he had tried everything else, and self defense is the only thing he had to go with. You saw him testify. Did you believe him? You heard his answers. You saw his demeanor. Somebody once told me that in jury trials you can never underestimate a person's ability to see the truth, to listen to someone speak, and determine whether or not they are telling the truth. Ladies and gentlemen, we are asking that you see the truth.

Tr. pp. 221-23.

On rebuttal, the State argued:

I think we all agree, and I think you will agree, you have to decide who you will believe and who you won't believe. There is no evidence of a gun on Mr. Kendrick. There are no signs of intoxication on Mr. Kendrick a half hour after the police were summoned. Mr. Kendrick has absolutely no motive to fabricate. Mr. Kendrick tells consistent stories of what happened. Then we have the defendant. Does an innocent man run? Does an innocent man hide the gun? Does an innocent man lie multiple times? Admittedly lie multiple times? Does an innocent man attempt to prevent the victim from cooperating with the State in the prosecution of this case? Does an innocent man send letters to try and take care of business? Does he try to get others to aid him in fabrication? His story is unbelievable. Now what happens? His cell phone did him in. Now he has to lie. What you are left with is the only reasonable version. You will be instructed by the Judge that when you hear two conflicting stories you will have to decide whom you will believe and whom you will disbelieve. And you should not discount the testimony of any witness

29

without careful thought and consideration. Look at the things like who has a motive to lie? Eric Kendrick has no motive. [McGill's] is huge. So you have to decide who you are going to believe. Someone who gets shot or someone who has admittedly lied on multiple occasions?

Tr. pp. 238-39. This argument was within the scope of the argument raised by the State during the first part of its closing argument regarding Kendrick's lack of motive to lie. As such, the trial court did not abuse its discretion by denying McGill a surrebuttal closing argument. *See Hughes*, 508 N.E.2d at 1299 (providing that the trial court did not abuse its discretion in denying Hughes's request to give surrebuttal because the alleged new facts and points were referred to in the first part of the State's closing argument).

Further, even assuming the State's argument relating to motive to lie had not been raised during the first part of the State's closing argument, to obtain a reversal on appeal, McGill must show that the complained of error affected his substantial rights. *Jones*, 825 N.E.2d at 935 (citing Ind. Trial Rule 61). McGill offers no analysis of how the denial of his request for surrebuttal violated his substantial rights and our review of the record shows no such violation.

### IV. Late Filing of Habitual Offender Allegation

McGill also contends that the trial court abused its discretion in permitting the State to belatedly file the habitual offender allegation. Indiana Code section 35-34-1-5(e)[1] provides:

---

[1] Indiana Code section 35-34-1-5(e) was amended, effective July 1, 2013, to read, in relevant part:

An amendment of an indictment or information to include a habitual offender charge under IC 35-50-2-8 … must be made at least thirty (30) days before the commencement of trial. However, upon a showing of good cause, the court may permit the filing of a habitual offender charge at any time before the commencement of the trial if the amendment does not prejudice the substantial rights of the defendant. If the court permits the filing of a habitual

30

> An amendment of an indictment or information to include a habitual offender charge under IC 35-50-2-8 ... must be made not later than ten (10) days after the omnibus date. However, upon a showing of good cause, the court may permit the filing of a habitual offender charge at any time before the commencement of the trial.

McGill requests that we reverse his habitual offender enhancement because the filing was untimely and there was no showing of good cause. For its part, the State argues that it had demonstrated good cause for belatedly filing the habitual offender allegation because there was a delay in obtaining some of the records pertaining to McGill's prior convictions.

The omnibus date in this case was June 23, 2011. The State filed its notice of intention to seek the habitual offender enhancement on September 23, 2011. McGill objected to the untimely filing.

On October 12, 2011, the trial court conducted a hearing on the matter. During this hearing, the State admitted that the habitual offender allegation should have been filed before the omnibus date and indicated that "[a]pparently for some reason it fell through the cracks." Tr. p. 321. The State, however, went on to provide an explanation which demonstrated good cause for the delay, stating that there was a delay because "there are two of the three priors alleged in the habitual charging information that are older that required getting those documents from old records." Tr. p. 321.

The State further indicated that its intent "from the beginning [was] to file the habitual offender enhancement," and that as of May 23, 2011, McGill was aware that the State

offender charge less than thirty (30) days before the commencement of trial, the court shall grant a continuance at the request of the: (1) state, for good cause shown; or (2) defendant, for any reason.

31

intended to seek a habitual offender enhancement. Tr. p. 322. On that date, the State sent McGill a proposed plea deal which included the habitual offender allegation. The State also asserted that McGill would not be prejudiced by the late filing because if the State were permitted to file the habitual offender allegation, McGill could request a continuance. At the conclusion of the October 12, 2011 hearing, the trial court granted the State permission to file the belated habitual offender allegation. The trial court also granted McGill's request for a continuance and found that with the continuance, the defense had ample time to investigate the paperwork relating to McGill's alleged status as a habitual offender.

"'By permitting the State to file the habitual offender count, the trial court impliedly found good cause.'" *Jackson v. State*, 938 N.E.2d 29, 39 (Ind. Ct. App. 2010) (quoting *Land v. State*, 802 N.E.2d 45, 53 (Ind. Ct. App. 2004), *trans. denied*).

> We review a trial court's finding of good cause for an abuse of discretion. [*Land*, 802 N.E.2d at 53] (citing *Watson v. State*, 776 N.E.2d 914, 918 (Ind. Ct. App. 2002)). "An abuse of discretion occurs 'only where the decision is clearly against the logic and effect of the facts and circumstances.'" *Id.* (quoting *Palmer v. State*, 704 N.E.2d 124, 127 (Ind. 1999)).

*Jackson*, 938 N.E.2d at 39. Here, the record indicates that the State argued that it had good cause for belatedly filing the habitual offender allegation because of a delay in obtaining some of the records pertaining to McGill's prior convictions. The trial court did not abuse its discretion in determining that this justification established good cause. *See id.* (concluding that the trial court acted within its discretion in allowing the State to belatedly file a habitual offender enhancement where the State argued that it had demonstrated good cause for the delay because it was unsure whether it would be able to obtain the records necessary to

32

charge Jackson as a habitual offender).

Moreover, McGill did not demonstrate that he was prejudiced by the late filing of the habitual offender allegation. "A defendant who challenges the State's filing of an habitual offender allegation on the ground that it is filed outside of the time limit *must* demonstrate that he was prejudiced." *Jackson*, 938 N.E.2d at 39 (quoting *Land,* 802 N.E.2d at 53) (emphasis added). "The purpose of Indiana Code section 35-34-1-5(e) is to allow a defendant sufficient time to prepare a defense for the habitual offender charge." *Id.* (citing *Land*, 802 N.E.2d at 53). McGill does not argue that he had insufficient time to prepare his defense to the habitual offender charge. McGill requested a brief continuance which was granted, and McGill had approximately one year between the hearing and the October 11, 2012 bench trial on his status as a habitual offender to prepare a defense. Because McGill has not presented any explanation of how he was prejudiced by the timing of the additional charge, his request that we reverse his habitual offender enhancement is denied. *See Jackson*, 802 N.E.2d at 53; *Land*, 802 N.E.2d at 53-54.

Furthermore, to the extent that McGill relies on the Indiana Supreme Court's opinion in *White v. State*, 963 N.E.2d 511 (Ind. 2012), we note that *White* is easily distinguishable from the instant matter. In *White*, the State did not articulate any grounds for good cause in its written motion requesting permission to belatedly file the habitual offender allegation. 963 N.E.2d at 517. There was no hearing on the State's motion, and the trial court never made an explicit finding of good cause when it granted the State's motion. *Id*. The Indiana Supreme Court found that appellant had waived his challenge to the trial court's decision to

33

permit the State to belatedly file the habitual offender allegation by not requesting a continuance, but noted that had the appellant preserved his claim for appellate review and the record continued to remain silent on the issue of "good cause," the Court likely would have reached a different conclusion. *Id*. at 517-18. As we concluded above, here, unlike in *White*, the State demonstrated and the trial court implicitly found good cause. *See Jackson*, 938 N.E.2d at 39; *Land*, 802 N.E.2d at 53-54.

## V. Sufficiency of Evidence to Sustain Habitual Offender Enhancement

Finally, McGill contends that the evidence is insufficient to sustain the trial court's determination that he is a habitual offender. Specifically, he argues that the habitual offender determination must be set aside because the documentation provided by the State is unreliable and cannot prove that the offenses occurred in the requisite sequence.

> To establish that the defendant is a habitual offender, the State must prove beyond a reasonable doubt that the defendant has been previously convicted of two separate and unrelated felonies. Ind. Code § 35-50-2-8. To be "unrelated," the commission of the second felony must be subsequent to the sentencing for the first, and the sentencing for the second felony must have preceded the commission of the current felony for which the enhanced sentence is being sought. *Toney v. State*, 715 N.E.2d 367, 369 (Ind. 1999). Failure to prove the proper sequencing requires that the habitual offender determination be vacated. *Henderson v. State*, 534 N.E.2d 1105, 1109 (Ind. 1989). In addressing the issue of sufficiency of evidence, we will affirm the conviction if, considering only the probative evidence and reasonable inferences supporting the verdict, without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude that the defendant was convicted of two previous separate and unrelated felonies beyond a reasonable doubt. *Id*.

*Flint v. State*, 750 N.E.2d 340, 341 (Ind. 2001).

The evidence demonstrates that McGill was convicted of Class C felony carrying a

34

handgun without a license on November 23, 1999. The charging information relating to this criminal conviction indicates that McGill committed the offense of Class C felony carrying a handgun without a license on or about January 19, 1999. McGill was sentenced for this conviction on November 23, 1999. The evidence further demonstrates that McGill was convicted of Class C felony battery on September 25, 2002. The charging information relating to this criminal conviction indicates that McGill committed the offense of Class C felony battery on or about January 26, 2002. McGill was sentenced for this conviction on September 25, 2002.

In support of his claim that the documents submitted by the State are unreliable, McGill points to alleged inconsistencies between the dates listed in the arrest records for the offenses and the corresponding dates listed in the charging informations. With respect to the November 23, 1999 conviction, the arrest record suggests that McGill was arrested outright in connection to the offense on January 19, 1998, rather than January 19, 1999, as indicated in the charging information. The arrest record, however, also includes a booking date of January 20, 1999, which could potentially suggest that the reference to January 19, 1998, was a mere scrivener's error.

Further, even if the discrepancies in the dates listed in the arrest record relating to the November 23, 1999 conviction are sufficient to render the document unreliable, the charging information was sufficiently linked to the abstract of judgment and could properly be relied on by the trial court. In *Beavers v. State*, 566 N.E.2d 533, 535 (Ind. 1991), the Indiana Supreme Court held that "[t]he date upon which an offense may have been committed is in

35

most instances to be found in the State's charging instruments, in transcripts of guilty plea proceedings, within the evidence admitted at trial, and in jury instructions given by the Court. Such date is not part of the fact of a prior conviction, the proof of which is restricted to authenticated documents." Again, the charging information relating to the November 23, 1999 conviction was sufficiently linked to the abstract of judgment relating to that conviction as both documents named McGill as the defendant, contained the same cause number, and were certified by the Clerk's Office as an authentic court documents. As such, we cannot conclude that the documents supplied by the State with respect to the November 23, 1999 conviction are unreliable.

Furthermore, to the extent that McGill claims that the evidence is insufficient because the abstract of judgment relating to the November 23, 1999 conviction was not file stamped by the Clerk's Office, we find McGill's claim to be without merit. "It is well-settled that 'the State must introduce into evidence proper certified and authenticated records of the defendant's prior felony convictions in order to prove beyond a reasonable doubt the existence of those prior convictions.'" *White*, 963 N.E.2d at 518 (quoting *Dexter v. State*, 959 N.E.2d 235, 238 (Ind. 2012)). We conclude that the Abstract of Judgment relating to the November 23, 1999 conviction qualifies as a properly certified and authenticated record because the Clerk's Office certified the document as an authentic court document.

With respect to the September 25, 2002 conviction, the charging information indicates that McGill committed the offense on January 26, 2002. The arrest record indicates that McGill was arrested by warrant on February 19, 2002. It does not seem illogical that there

might be a delay in arresting a perpetrator when the individual is not arrested outright at the time he committed the offense but rather is latter arrested by virtue of a warrant for the individual's arrest. In addition, as was the case with the documents relating to the November 23, 1999 conviction, the charging information relating to the September 25, 2002 conviction was sufficiently linked to the abstract of judgment relating to that conviction as both documents listed McGill as the defendant, contained the same cause number, and were certified by the Clerk's Office as an authentic court documents. As such, we cannot conclude that the discrepancy in the date that McGill was alleged to have committed the offense and the date that he was actually arrested in connection to the offense does not render the certified documents unreliable.

The evidence establishes that McGill has accumulated two prior, unrelated felonies. The evidence is sufficient to prove that the commission of the second felony occurred after McGill had been sentenced for the first. As a result, McGill qualifies as a habitual offender. McGill's claim to the contrary essentially amounts to a request that we reweigh the evidence, which we will not do. *Flint*, 750 N.E.2d at 341.

## CONCLUSION

Having concluded that the trial court acted within its discretion in admitting the evidence recovered from McGill's residence, that McGill has failed to demonstrate that the State committed prosecutorial misconduct, that the trial court acted within its discretion in denying McGill's request to give surrebuttal during closing argument, that the trial court acted within its discretion in permitting the State to file the belated habitual offender

37

allegation, and that the evidence is sufficient to sustain the trial court's determination that

McGill is a habitual offender, we affirm.

The judgment of the trial court is affirmed.

BAILEY, J., and MAY, J., concur.